**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALBERT J. STARNES,

*Petitioner-Appellee,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellant.*

No. 11-1636

ESTATE OF SALLIE C. STROUPE,

*Petitioner-Appellee,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellant.*

No. 11-1706

ANTHONY S. NAPLES,

*Petitioner-Appellee,*

v.

COMMISSIONER OF INTERNAL
REVENUE,

*Respondent-Appellant.*

No. 11-1712

RONALD D. MORELLI, SR.,

                   *Petitioner-Appellee,*

          v.                              No. 11-1714

COMMISSIONER OF INTERNAL
REVENUE,

                   *Respondent-Appellant.*

Appeals from the United States Tax Court.
(Tax Ct. Nos. 5199-09; 5200-09; 5202-09; 5201-09)

Argued: March 22, 2012

Decided: May 31, 2012

Before NIEMEYER, DAVIS, and WYNN, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the opinion, in which Judge Niemeyer joined. Judge Wynn wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Francesca Ugolini Tamami, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Robert Leon Widener, MCNAIR LAW FIRM, PA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Tamara W. Ashford, Deputy Assistant Attorney General, Gilbert S. Rothenberg, Kenneth L. Greene, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.

**OPINION**

DAVIS, Circuit Judge:

In *Commissioner v. Stern*, 357 U.S. 39 (1958), the Supreme Court held that if a person is the "transferee" of a taxpayer's assets, the "existence and extent" of that transferee's liability for unpaid taxes the taxpayer owed prior to the transfer is determined by state law, not federal law. *Id.* at 45. This case requires that we apply *Stern* to a transaction the Commissioner of Internal Revenue characterizes as an "intermediary transaction tax shelter."

Albert J. Starnes, Ronald D. Morelli, Sr., Anthony S. Naples and Sallie C. Stroupe (collectively, the "Former Shareholders") worked at Tarcon, Inc., a trucking company, for over forty years, and together purchased the company in 1972, each holding a 25 percent stake. In 2003, they decided to sell their interests and retire. After consulting with their real estate broker, accountant and attorneys, they sold Tarcon's only remaining asset (a warehouse) to one company, ProLogis, Inc., and sold their Tarcon stock to another company, MidCoast Investments, Inc. (together with its affiliates MidCoast Credit Corp. and MidCoast Acquisitions Corp., hereinafter "MidCoast"). MidCoast contractually agreed that it would operate Tarcon as a going concern and cause Tarcon to pay the approximately $880,000 in federal and state corporate income taxes Tarcon owed on the income the company received from selling the warehouse. Having become the sole stockholder of Tarcon, however, within a few weeks MidCoast sold Tarcon to another company, which transferred Tarcon's cash to an offshore account. Tarcon's 2003 tax returns claimed certain losses that purported to offset entirely the tax liability it incurred on the income from the sale of the warehouse. When the Internal Revenue Service ("IRS" or "the Commissioner") audited the federal return, it disallowed those losses and thereby imposed the tax liability, but Tarcon never paid the taxes.

Unable to secure payment from Tarcon, the IRS turned its efforts toward the Former Shareholders, asserting they were themselves liable, as transferees, for Tarcon's unpaid taxes. Starnes, Morelli, Naples and the Estate of Sallie C. Stroupe filed petitions in the Tax Court contesting the Commissioner's notices of transferee liability. After a bench trial, the Tax Court ruled in favor of the Former Shareholders.[1] Applying *Stern*, the Tax Court held that the Commissioner could only collect from the Former Shareholders if, under North Carolina law, a Tarcon creditor could recover payments of Tarcon's debts from the Former Shareholders. And applying North Carolina law to the evidence presented at trial, the court held that the Commissioner had not made the requisite showing. On appeal, the Commissioner argues the Tax Court (1) committed legal error in its interpretation of federal law and its application of state law and (2) clearly erred in making certain factual findings.

Having carefully considered the parties' arguments in light of the record before us in this appeal, we conclude that the Commissioner's contentions lack merit. The Tax Court properly identified and applied the controlling legal framework as set forth in *Stern* and it did not commit clear error in its factual findings. Therefore, we affirm the judgment in favor of the Former Shareholders.

I.

A.

Starnes, Morelli, Naples and Stroupe began working at Tarcon, a freight consolidation company, in the 1950s and 1960s. Each rose through the ranks and, acting jointly, they purchased Tarcon in 1972. They operated Tarcon for decades,

---

[1]Although the Estate of Stroupe was the party in the Tax Court and is the party on appeal, for consistency we refer to Stroupe or her Estate, together with Starnes, Morelli and Naples, as the "Former Shareholders."

but business dropped off in the 1980s when the trucking industry was deregulated. By 2003, Tarcon had ceased business operations, and its sole remaining non-cash asset was a large industrial warehouse in Charlotte, North Carolina, which it leased to others, generating income.[2] In 2003, the Former Shareholders decided to retire and liquidate their interests in Tarcon. Their goal was to maximize their after-tax proceeds and minimize the expenses involved in any transactions.

The Former Shareholders (who were also officers of Tarcon) considered various options. One option was to sell the warehouse, wind up the business, and distribute the resulting cash assets to the shareholders. Another option was to maintain Tarcon as a going concern and sell their Tarcon stock. Yet another option was a combined asset/stock sale, in which Tarcon would sell the warehouse and then the Former Shareholders would sell their stock in Tarcon (the sole asset of which by then would be cash). They hired an independent broker, Brad Cherry, a commercial real estate broker with Keystone Partners, L.L.C., to act as an agent and adviser in connection with leasing and/or selling the warehouse or selling Tarcon stock.

Cherry began marketing Tarcon's assets and/or its stock in light of the various options. Cherry received letters from several parties expressing interest in purchasing the warehouse. One of these letters was from ProLogis, a Maryland real estate investment trust, which in April 2003 offered to purchase the warehouse for $3,025,000.

By that time, the Former Shareholders had also received (via Cherry) a letter of intent from MidCoast, which

---

[2]Until 2003 Tarcon also owned four vehicles and a condominium in Garden City, South Carolina. In 2003, the South Carolina property was sold for $190,752 and the vehicles were sold to the Tarcon shareholders. The proceeds of these sales were deposited in Tarcon's bank account.

expressed interest in buying Tarcon's stock from the Former Shareholders. MidCoast's letter, dated May 21, 2003, stated:

> MidCoast is interested in purchasing the stock of certain C-corporations that have sold business assets and/or real estate. In instances where a C-corporation has sold assets for a gain, MidCoast may have an interest in purchasing 100% of the stock from the shareholders for a price greater than the net value of the corporation.
>
> MidCoast pursues these acquisitions as an effective way to grow our parent company's core asset recovery operations. It is important to note that after we complete a stock acquisition, the target company is not dissolved or consolidated, but is reengineered into the asset recovery business and becomes an income producer for us going forward.

J.A. 104. MidCoast also provided a brochure describing the benefits to the Former Shareholders and Tarcon of undertaking a joint asset/stock sale. The brochure stated its proposal would "maximize [the Former Shareholders'] net after-tax proceeds," "maximize( ) sale of all assets (i.e., written-off receivables, etc.)," and "[r]educ[e] exposure to future claims, losses, and litigation." J.A. 111. MidCoast's materials also represented that Tarcon would not be "dissolved, liquidated, or merged into another Company." *Id.* Rather, MidCoast would "put( ) Company into asset recovery business and operate( ) Company on a go-forward basis." *Id.* Furthermore, MidCoast would "cause( ) the Company to satisfy its tax and other liabilities." *Id.*

On June 30, 2003, two MidCoast representatives met with Cherry and the Former Shareholders, together with their accountant and attorney, in North Carolina. By that time, ProLogis had submitted a revised letter of intent, and MidCoast knew that Tarcon was negotiating with ProLogis for the

sale of the warehouse. Thus it was understood at the June 30 meeting that when MidCoast purchased the stock, Tarcon's only asset would be cash. At the meeting, the MidCoast representatives reiterated that if the Former Shareholders were to go forward with the proposed transaction, MidCoast would replace the Former Shareholders as owners of the company, Tarcon would continue to operate under MidCoast's ownership, and the 2003 Tarcon tax liabilities would be satisfied. Every witness who knew the details of the stock sale, including the attorney for MidCoast, testified that they had no reason to believe MidCoast would not honor these commitments. MidCoast also explained that it had undertaken a number of transactions of this type.

As for the tax benefits, MidCoast supplied a chart that compared the after-tax consequences to the Former Shareholders of a liquidation of Tarcon versus a stock sale. With a liquidation, the Former Shareholders would effectively be taxed twice: once on the net taxable corporate gain generated from selling the warehouse and again on the income generated from the distribution of Tarcon's cash to the Former Shareholders. With a stock sale, they would only be taxed once, on their capital gains; the corporate income taxes would be the responsibility of Tarcon's new owner, i.e., MidCoast.

The Former Shareholders testified they did not understand what was meant by the "asset recovery business" or what MidCoast planned to do with Tarcon, but they made no inquiries. J.A. 707, 759-61, 823-24. Naples thought "it did sound strange," but he believed that MidCoast bought "bad debts" to "use . . . as a write-off against the companies they buy that have money." J.A. 759. Starnes testified that "[i]t wasn't something I wanted to understand. Once they bought my stock, they could do what they wanted with Tarcon." J.A. 824. At one point, Tarcon's accountant, Jerome Epping, who also was the Former Shareholders' accountant and who had attended the meeting with MidCoast, made a notation on an untitled and undated MidCoast worksheet questioning,

"'2001-16' reportable?," J.A. 603, referring to I.R.S. Notice 2001-16, which describes certain "intermediary transactions tax shelters," transactions that in certain ways are similar to the transactions at issue here.[3] The Commissioner, however,

---

[3]In Notice 2001-16, the IRS announced that it "may challenge the purported tax results" of certain transactions it considered that type of tax shelter. I.R.S. Notice 2001-16, 2001-1 C.B. 730 (Feb. 26, 2001). The transactions involved, among other things, the sale of a corporation's stock to one corporation (an "intermediary corporation") and sale of its assets to a different person or entity. The primary purpose of the Commissioner's efforts is to ensure he collects taxes due on long-term gains on the assets. In full, the pertinent part of the Notice explains:

> These transactions generally involve four parties: seller (X) who desires to sell stock of a corporation (T), an intermediary corporation (M), and buyer (Y) who desires to purchase the assets (and not the stock) of T. Pursuant to a plan, the parties undertake the following steps. X purports to sell the stock of T to M. T then purports to sell some or all of its assets to Y. Y claims a basis in the T assets equal to Y's purchase price. Under one version of this transaction, T is included as a member of the affiliated group that includes M, which files a consolidated return, and the group reports losses (or credits) to offset the gain (or tax) resulting from T's sale of assets. In another form of the transaction, M may be an entity that is not subject to tax, and M liquidates T (in a transaction that is not covered by § 337(b)(2) of the Internal Revenue Code or § 1.337(d)–4 of the Income Tax Regulations, resulting in no reported gain on M's sale of T's assets.

> Depending on the facts of the particular case, the Service may challenge the purported tax results of these transactions on several grounds, including but not limited to one of the following: (1) M is an agent for X, and consequently for tax purposes T has sold assets while T is still owned by X, (2) M is an agent for Y, and consequently for tax purposes Y has purchased the stock of T from X, or (3) the transaction is otherwise properly recharacterized (e.g., to treat X as having sold assets or to treat T as having sold assets while T is still owned by X). Alternatively, the Service may examine M's consolidated group to determine whether it may properly offset losses (or credits) against the gain (or tax) from the sale of assets.

did not present evidence of what the MidCoast worksheet entailed, why Epping made the notation, or whether he communicated with the Former Shareholders regarding potential concerns about transferee liability.

B.

Having reviewed MidCoast's proposal, the Former Shareholders decided to accept it: Tarcon would sell the warehouse to ProLogis, and the Former Shareholders would sell their Tarcon stock to MidCoast. On July 30, 2003, ProLogis agreed to buy the Granite Street property for $3.18 million. The sale closed on October 30, 2003, and Tarcon received net proceeds of $2,567,901.83.

Meanwhile, Morelli had been negotiating with MidCoast for the purchase of the Tarcon stock. MidCoast proposed purchasing the stock for an amount equal to Tarcon's cash less a percentage of Tarcon's estimated federal and state tax liability for 2003. The negotiations focused on that percentage, referring to the excess of the purchase price over the net value of Tarcon as the "asset recovery premium." J.A. 711-12, 150. The parties retained prominent law firms to represent them in the stock sale. MidCoast engaged the law firm of Womble, Carlyle, Sandridge & Rice ("Womble Carlyle"), and the Former Shareholders engaged Moore & Van Allen, as counsel. On July 16, 2003, on behalf of Tarcon, Morelli executed a letter of intent to sell the Tarcon stock to MidCoast. The parties agreed MidCoast would buy all of Tarcon's stock for an

---

*Id.* In 2008 the Commissioner issued another notice to "clarif[y]" Notice 2001-16. *See* I.R.S. Notice 2008-111, 2008-51 I.R.B. 1299 (Dec. 2, 2008). Among other things, Notice 2008-111 explained that a transaction "is treated as an Intermediary Transaction with respect to a particular person" only if that person "knows or has reason to know the transaction is structured" in a way such that "the person or persons primarily liable for any Federal income tax obligation with respect to the disposition of the Built-in Gain Assets will not pay that tax." *Id.*

amount equal to Tarcon's cash less 56.25 percent of Tarcon's local, state, and federal corporate income taxes for 2003. Mid-Coast also agreed to reimburse the Former Shareholders and Tarcon for legal and accounting fees, up to $25,000.

As of October 31, 2003, after the warehouse was sold, Tarcon had approximately $3.1 million in cash and no other tangible assets. The sale resulted in a corporate income tax liability of approximately $880,000, in a pro forma calculation by Tarcon's then accountant.[4] Thus, as of October 31, Tarcon's total assets were $3.1 million and its total liabilities were $880,000, resulting in a net worth of approximately $2.2 million.

As mentioned, the principal subject of negotiation had been how much of Tarcon's $880,000 tax liability MidCoast would deduct from the value of Tarcon's $3.1 million in cash to determine the amount it was willing to pay for the Tarcon stock. After the warehouse sale closed, the parties reached an agreement: MidCoast would pay the Former Shareholders approximately $2.6 million for their stock. This figure meant the Former Shareholders would contribute 56.25 percent of Tarcon's presumed 2003 tax liability, and MidCoast would cover the remainder. The stock sale closed on November 13, 2003. In the final Share Purchase Agreement, MidCoast reiterated a number of the commitments it had been making all along, including that it would "file all Federal and state income tax returns related to the [$881,627.74] Deferred Tax Liability on a timely basis." J.A. 247.

After executing the Agreement, the Former Shareholders resigned as officers of Tarcon and gave their original Tarcon share certificates to their attorney at Moore & Van Allen. Tarcon's $3.1 million in cash was transferred to an escrow

---

[4]Tarcon's total gain on the warehouse, which it had bought in January 1978, was $2,366,915. This long-term gain resulted in an expected 2003 tax liability of $881,627.74.

account of Moore & Van Allen, and MidCoast's $2.6 million purchase money was transferred to its attorneys' escrow account.[5] The Former Shareholders' attorney at Moore & Van Allen then hand delivered the Tarcon share certificates and other original closing documents to Womble Carlyle's office and transferred Tarcon's cash into Womble Carlyle's escrow account. From that account, which temporarily held both Tarcon's and MidCoast's money, $649,034 was transferred to each of the Former Shareholders (which they later reported as income on their 2003 individual tax returns), and $25,000 was transferred to Moore & Van Allen as reimbursement for its services.

According to the Agreement, Tarcon's $3.1 million was supposed to be transferred into Tarcon's "post-closing" bank account. In fact, the cash took a detour. The closing attorney at Womble Carlyle, rather than transferring the money to Tarcon's post-closing account, transferred the funds from the Womble Carlyle trust account to the "MidCoast Credit Corp. Operating Account." The record does not disclose how or why this apparent mistake was made. In any event, the error was remedied the next day, when the $3.1 million was wired from the MidCoast operating account to a new Tarcon account at SunTrust Bank.

## C.

If all had gone as the Former Shareholders testified they thought it would, MidCoast would have continued operating Tarcon and in 2004 paid Tarcon's 2003 taxes. That is not what happened. Instead, on November 24, 2003, eleven days after the November 13 closing, MidCoast sold its Tarcon stock to Sequoia Capital, L.L.C., a Bermuda company, for $2,861,465.96. Two days later, all of the funds in Tarcon's

---

[5]As the Tax Court aptly put it: "Thus, there was an infusion of cash into the transaction, not a circular flow of cash." 101 T.C.M. (CCH) 1283, 2011 WL 894608, at *8.

SunTrust account were transferred to an account with Deutsche Bank AG, though still under Tarcon's name. Then, on December 1, 2003, $2,960,000 was transferred from the Deutsche Bank account to an account in the Cook Islands in the name of "Delta Trading Partners," and $126,822 was transferred to a MidCoast bank account. After December 1, 2003, Tarcon never had more than $132,320 in any account.

Tarcon filed its 2003 federal tax return in July 2004, reporting capital gains of $1,009,483 and ordinary income of $1,557,315, principally from the sale of the warehouse and the related grounds. Tarcon also reported, however, two large losses. First, it reported a short-term capital loss of $1,010,000 resulting from a purported December 2003 interest rate swap option. Second, it reported an ordinary loss of $1,950,000 resulting from a transaction involving an asset denominated "DKK/USD BINA," which was purportedly acquired on December 29, 2003, and purportedly sold on December 31, 2003. *Id.* Consequently, the 2003 return stated Tarcon's only asset was $132,320 in cash. Thus, the return reported an overall loss and no tax due. In 2005, Tarcon filed its 2004 federal tax return, marked as its final return, reporting no tax due and no assets.

## D.

In 2005, in the midst of a "promoter penalty examination" of MidCoast, the IRS audited Tarcon's 2003 tax return. The IRS disallowed the claimed deductions for the short-term capital loss of $1,010,000 and the ordinary loss of $1,950,000. The IRS sent a notice of deficiency dated April 11, 2007, to Tarcon, in which it explained:

> You have failed to prove that the disposition of the inflated basis assets generated a bona fide loss. In addition, it is determined that the inflated basis assets transaction lacked economic substance. Accordingly,        taxable        income        is        increased

$2,959,483.00 for taxable year ending December 31, 2003.

J.A. 537. Having disallowed the claimed losses, the IRS determined that Tarcon owed an income tax deficiency for 2003 of $855,237. The IRS also imposed an accuracy-related penalty of $342,094.

Tarcon did not seek a redetermination of the asserted deficiency in the Tax Court, and so an assessment of tax, penalty and interest totaling $1,495,641 was made on September 17, 2007. Tarcon did not pay any portion of the deficiency, penalty or interest for the underlying 2003 assessment. Nor was the IRS able to satisfy the tax liability from tax liens it filed in North Carolina and Nevada.

In December 2008, the IRS sent notices of transferee liability to each of the Former Shareholders. The notices identified the amount each Former Shareholder received when he or she sold Tarcon shares to MidCoast, and stated that, as transferees, they were liable for Tarcon's tax liability up to the amount each received for those shares (not including applicable interest). An attached notice of liability statement advised that the IRS did not recognize the "purported stock sale" to MidCoast. J.A. 20. "[T]he stock sale and the transactions involving the sale of Tarcon, Inc.'s assets to ProLogis," the notice continued, "are determined to be, in substance, a sale of the assets of Tarcon, Inc., followed by a distribution by Tarcon, Inc. of its proceeds to its shareholders." *Id.* The attachment further explained that the transaction is "substantially similar to an Intermediary transaction shelter described in Notice 2001–16, 2001–1 C.B. 730," or, alternatively, the transaction is in substance a sale of the Tarcon assets to ProLogis followed by a redemption of Tarcon stock owned by the Tarcon shareholders. *Id.*

The Former Shareholders filed petitions in the United States Tax Court contesting the notices of transferee liability.

As discussed in detail below, the Tax Court ruled in favor of the Former Shareholders, finding the IRS had failed to carry its burden of proving the Former Shareholders were liable as transferees for Tarcon's 2003 taxes. *Starnes v. Commissioner*, 101 T.C.M. (CCH) 1283, 2011 WL 894608 (2011). The Commissioner timely appealed.

## II.

We review decisions of the United States Tax Court "on the same basis as decisions in civil bench trials in United States district courts." *Waterman v. Comm'r*, 179 F.3d 123, 126 (4th Cir. 1999). Questions of law are reviewed de novo, and findings of fact for clear error. *Id.* The Commissioner challenges both the Tax Court's legal conclusions and its findings of fact. We begin by explicating the legal framework applicable in cases of this sort. We then explain why we discern no error in the lower court's application of the controlling legal principles. Finally, we examine the evidence and explain why we are not persuaded by the Commissioner's contention that the lower court committed clear error in its factual findings.

## A.

Until 1926, if the government was unable to collect taxes from a particular taxpayer and believed the taxpayer's assets had been transferred to someone else, the government could only proceed against the "transferee" of those assets by bringing a bill in equity or an action at law. *See Stern*, 357 U.S. at 43. These procedures "proved unduly cumbersome, however, in comparison with the summary administrative remedy allowed against the taxpayer himself." *Id.* Thus, in 1926 Congress authorized the Commissioner to collect taxes from transferees of a taxpayer's assets "by the procedure provided in the [Internal Revenue Code] for the enforcement of tax deficiencies." *Id.* (quoting S. Rep. No. 52, 69th Cong., 1st Sess. 30). It enacted the predecessor of 26 U.S.C. § 6901(a),

which today in pertinent part (only non-substantive revisions having been made since 1926) reads as follows:

> Method of collection.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be *assessed, paid, and collected* in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:
>
>> (1) Income, estate, and gift taxes.—
>>
>>> (A) Transferees.—The liability, at law or in equity, of a transferee of property—
>>>
>>>> (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes) . . .

26 U.S.C. § 6901(a) (emphasis added). A "transferee" includes a "donee, heir, legatee, devisee, [or] distributee." *Id.* § 6901(h). Treasury regulations further provide that "the term 'transferee' includes . . . the shareholder of a dissolved corporation, . . . the successor of a corporation, . . . and all other classes of distributees." 26 C.F.R. § 301.6901-1(b).

In *Stern*, the government sought to collect from a widow whose husband had died deficient in his payment of income taxes. 357 U.S. at 40. The husband had held a life insurance policy from which he could draw down cash during his life, and which named his wife as the beneficiary. *Id.* at 41. The question was whether the widow's "substantive liability" for her deceased husband's tax deficiency was to be determined "by state or federal law." *Id.* at 42. After closely examining § 6901's legislative history, the Court concluded Congress intended § 6901 to be "purely a procedural statute." *Id.* at 44. To determine a transferee's "substantive liability," the Court concluded it must look to sources other than § 6901. No other

federal statute having defined transferees' substantive liability, the Court was required to choose between "federal decisional law and state law." *Id.* Citing *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), the Court concluded, "[U]ntil Congress speaks to the contrary, the existence and extent of liability should be determined by state law," specifically the law of the state where a particular transfer was made. 357 U.S. at 45.

The Commissioner had argued federal common law should apply to a transferee's substantive liability, in part because "the varying definitions of liability under state statutes resulted in an absence of uniformity of liability." *Id.* The Court did not find this argument based on absence of uniformity persuasive. Congress knew courts had been applying state law "developed for the protection of private creditors" to determine transferees' liability for a transferor's federal taxes. *Id.* at 44-45. Yet Congress, "with knowledge that this was 'existing law'[,] . . . refrained from disturbing the prevailing practice." *Id.* The Court explained:

> Uniformity is not always the federal policy. Under § 70 of the Bankruptcy Act, for instance, state law is applied to determine what property of the bankrupt has been transferred in fraud of creditors. What is a good transfer in one jurisdiction might not be so in another. . . . Since Congress has not manifested a desire for uniformity of liability, we think that the creation of a federal decisional law would be inappropriate in these cases.

*Id.* at 45 (citations omitted). "Congress has not seen fit to define that liability," and so "none exists except such as it is imposed by state law." *Id.* at 47. In *Stern*, "Kentucky law impose[d] no liability against [Stern] in favor of [her husband's] other creditors," and therefore she was not liable for her deceased husband's unpaid taxes. *Id.*

Thus, *Stern* stands for the proposition that § 6901 "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Id.* at 42. As the Tax Court in this case properly articulated, § 6901 "provides a procedure through which the IRS may collect unpaid taxes owed by the transferor of the assets from a transferee if an independent basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts." *Starnes*, 2011 WL 894608, at *6. "[T]he Government's substantive rights against the transferee are precisely those which other defrauded creditors would have under the law of the state in which the transfers were made." *John Ownbey Co. v. Commissioner*, 645 F.2d 540, 543 (6th Cir. 1981) (internal parentheses and quotation marks omitted).

Notably for our purposes, *Stern* also teaches another lesson: whether there has been a "transfer" within the meaning of § 6901 (and concomitantly whether a person is a "transferee" within the meaning of the statute)—a question undisputedly of federal law—is a separate question from whether the alleged transferee is substantively liable for a transferor's unpaid taxes. In *Stern*, the Court assumed without deciding that Stern was "a transferee within the meaning of [§ 6901]." *Stern*, 357 U.S. at 41-42. Having avoided deciding that procedural question, it held the Commissioner could not prevail because "Kentucky statutes govern the question of the beneficiary's liability," and under Kentucky law Stern was not liable to her deceased husband's creditors. *Id.* at 42.

Thus, to collect taxes from an alleged transferee, the Commissioner must prevail on each of these independent requirements, one procedural and governed by federal law, the other substantive and governed by state law. The burden of proof on each is on the Commissioner. 26 U.S.C. § 6902(a) ("In proceedings before the Tax Court the burden of proof shall be

upon the Secretary to show that a petitioner is liable as a transferee of property of a taxpayer . . .").[6]

### B.

In the instant case, the Commissioner seeks to collect from the Former Shareholders the taxes Tarcon owed for 2003 and did not pay. As for the availability of the § 6901 collection procedure, he asserts the economic "reality" is that the November 13-14, 2003, transactions resulted in the transfer of Tarcon's cash to the Former Shareholders, and thus they are distributees of Tarcon's assets. On the substantive prong of the analysis, the Commissioner argues four provisions of North Carolina law would each render the Former Shareholders liable to Tarcon's creditors for debts incurred by Tarcon prior to the sale of Tarcon stock to MidCoast (and thereby render them actually liable for Tarcon's unpaid 2003 taxes): three provisions of the North Carolina Uniform Fraudulent Transfer Act ("NCUFTA"), and the common-law doctrine of corporate trust fund liability.

In the proceedings below, the Tax Court, following the Supreme Court's lead in *Stern*, assumed the Commissioner had proven the Former Shareholders were transferees within the meaning of § 6901, and therefore could invoke the administrative procedure provided by that section. After resolving that issue in the Commissioner's favor, the Tax Court proceeded to determine whether the Commissioner had satisfied his burden to prove the Former Shareholders' substantive liability, i.e., whether "an independent basis exists under applicable State law or State equity principles for holding the

---

[6]While the Commissioner does not have the burden to show "that the taxpayer [Tarcon] was liable for the tax," 26 U.S.C. § 6902(a), that is irrelevant here because whether Tarcon was liable for the approximately $881,000 in corporate income taxes in 2003 is not disputed. The disputed issues are whether the Shareholders are transferees under § 6901 and whether they are liable to Tarcon's creditors under North Carolina law.

transferee liable for the transferor's debts." *Starnes*, 101 T.C.M. (CCH) 1283, 2011 WL 894608, at *6. The Tax Court, after a bench trial and making factual findings, rejected each of the proffered bases for substantive liability in a 33-page memorandum opinion.

As mentioned, on appeal the Commissioner argues the Tax Court applied incorrect legal principles and committed clear error in making several of its factual findings. We address each of the Commissioner's arguments in turn.

C.

The Commissioner first argues, and our good colleague agrees in his dissenting opinion, the Tax Court committed legal error by treating the question of the Former Shareholders' substantive liability under state law as independent of whether, under § 6901, they are "transferees." The Commissioner reads § 6901 as requiring a two-step analysis with the second step wholly dependent on the first step. First, the Commissioner and the dissent argue, courts should determine whether a person or entity is a "transferee" under federal law, that is, whether a particular set of transactions should be recast under the "substance-over-form" doctrine derived from federal tax cases. Second, the Commissioner and the dissent argue, courts should apply state law to the transactions *as recast under federal law*. In other words, they argue, the "facts" to which we apply state law, such as state fraudulent conveyance statutes, depend in part on whether someone is a "transferee" for § 6901 purposes; therefore, the first step is a "threshold question," one courts must resolve before deciding whether a person or entity is substantively liable under state law. *See, e.g.*, Appellant's Br. at 34 ("The Tax Court, however, never directly addressed whether the Shareholders were transferees. This was legal error.").

*Stern* forecloses that argument. In *Stern*, as noted, the Court addressed whether a person's "substantive liability" was

determined by state or federal law. 357 U.S. at 42. On that question, it concluded state law applied. In reaching that conclusion, it *assumed without deciding* that Stern was "a transferee within the meaning of [§ 6901]." *Id.* at 41-42. If Stern's liability under state law had somehow depended on whether she was a transferee under federal law, the Court could not have found it "unnecessary to decide whether [she] was a transferee within the meaning of [§ 6901]." *Id.* The Court did find it unnecessary to decide that question, however, and thus it did not undertake to make a threshold determination of whether there was a "transfer" that informed the application of state law to the facts. Moreover, the Court explicitly considered § 6901 "purely a procedural statute," and the "existence and extent" of an alleged transferee's substantive liability to be determined purely as a matter of state law. *Stern*, 357 U.S. at 44-45.

Furthermore, while the dissent argues *Stern* is distinguishable, the supposedly distinguishing factors it relies upon are immaterial. In *Stern*, the state-law basis for the alleged transferee's substantive liability required evidence that the decedent paid his life insurance premiums "with intent to defraud his creditors"; if he had, then the disbursement of the policy to his widow would be considered fraudulent with respect to his creditors, at least to the extent of the "premiums paid in fraud of [those] creditors." 357 U.S. at 46 n.4 (citing Ky. Rev. Stat. Ann. § 297.140 (1948)). Here, unlike in *Stern*, one element of each of the state-law bases for liability is that there was a "transfer." Also unlike in *Stern*, there are multiple transfers we must decide whether to "collapse" to determine whether they were fraudulent (i.e., we must determine "*which* transaction is under review," Dissenting Op. at 43). In light of these distinctions, the dissent argues, *Stern* does not apply here, and, unconstrained by *Stern*, we should apply federal law rather than state law to decide which if any transfers to collapse.

*Stern*, however, did not turn on whether there is overlap between the factual determinations required by the federal-

law and state-law prongs of the analysis. Rather, the Court treated those two questions as entirely independent; whether there was a "transfer" of assets from the decedent to Stern (for § 6901 purposes) was irrelevant to whether that transfer was fraudulent (for state law purposes). We are unpersuaded that *Stern*'s instruction that state law governs substantive liability is inapplicable where one element of the relevant state law is that there was a "transfer." Similarly, as we explain in greater detail below, we believe the question of which if any of the multiple transactions should be "collapsed" to determine whether they were fraudulent is a question of *substantive liability*, not merely a question of *the availability of the § 6901 procedure*, and thus is governed by state law.

In short, we conclude *Stern* forecloses the Commissioner's efforts to recast transactions under federal law before applying state law to a particular set of transactions. An alleged transferee's substantive liability for another taxpayer's unpaid taxes is purely a question of state law, without an antecedent federal-law recasting of the disputed transactions. In terms of "the existence and extent of liability," *Stern* places the IRS in precisely the same position as that of ordinary creditors under state law. 357 U.S. at 45; *see also Sellers v. Comm'r*, 592 F.2d 227, 229 (4th Cir. 1979) (affirming Tax Court judgment against transferee because (1) the taxpayer's profits "found their way into petitioner's possession" and (2) the transfer was void under Virginia law because Sellers received the proceeds without paying consideration and intended to hinder and delay creditors); *C.D. Constr. Corp. v. Comm'r*, 451 F.2d 470, 471-72 (4th Cir. 1971) (affirming Tax Court judgment against alleged transferee because (1) "in substance" it had received a corporate distribution from the taxpayer and (2) no consideration was given, and so the distribution was void under West Virginia law).

In this case, because the two questions are independent, and because the Commissioner has failed to prove the Former Shareholders are liable under state law (as explained within),

we need not and do not decide whether they are the "transferees" of Tarcon's cash within the meaning of § 6901. The Commissioner's position that the "substance-over-form" doctrine developed in federal tax cases governs the latter question, that the doctrine disregards the parties' actual or constructive knowledge (or lack thereof), and that in substance the Former Shareholders received a distribution of Tarcon's cash (with MidCoast receiving a "fee"), may well be a correct framing of the issues related to the § 6901 "transferee" question.[7] But because the Commissioner's efforts fail on the state-law front, we proceed directly to explain why the Tax Court did not commit legal error or clear factual error in concluding the Former Shareholders are not liable under North Carolina law.

### D.

We turn now to the state-law bases for the Former Shareholders' alleged substantive liability. The first three arise under North Carolina's version of the Uniform Fraudulent Transfer Act, the NCUFTA. The fourth arises under North Carolina common law.

### 1.

We begin with the first of the three NCUFTA provisions

---

[7]Or it may be incorrect. In one of the other transferee liability cases recently decided by the Tax Court, the court rejected the Commissioner's efforts to recast certain transactions using the substance-over-form doctrine precisely *because* the original shareholders of the corporation being sold "had no reason to believe that [the stock purchaser's] methods were illegal or inappropriate" and thus "did not have a duty to inquire further and are not responsible for any tax strategies [an affiliate of the stock purchaser] used after the closing of the stock sale." *Slone v. Comm'r*, 103 T.C.M. (CCH) 1265, 2012 WL 691401, *10 (2012). We need not and do not decide the extent to which, if any, a person or entity's constructive knowledge is relevant to the application of the federal substance-over-form doctrine in this context.

relied on by the Commissioner: N.C. Gen. Stat. § 39-23.5. That subsection provides in pertinent part that a "transfer" made by a debtor "is fraudulent as to a creditor whose claim arose before the transfer was made," if the debtor (1) made the transfer "without receiving a reasonably equivalent value in exchange," and (2) "was insolvent at that time" or "became insolvent as a result of the transfer." *Id.*

This is where the Commissioner and dissent argue the "transferee" determination under federal law informs the determination of liability under state law. The argument is as follows: Under the substance-over-form doctrine developed in federal tax cases, the Former Shareholders received a "transfer" of Tarcon's cash. The fact that a "transfer" occurred for § 6901 purposes means a "transfer" occurred for NCUFTA purposes. As the "creditor[s]" in that "transfer," the Former Shareholders were required to give Tarcon "a reasonably equivalent value in exchange," lest Tarcon become "insolvent as a result of the transfer." N.C. Gen. Stat. § 39-23.5. The Former Shareholders did not give Tarcon "reasonably equivalent value" in exchange for its cash, says the Commissioner, because as of December 1, 2003, Tarcon was left with just $132,000; therefore, the Commissioner argues, the "transfer" was "fraudulent" as to the Former Shareholders, and the Former Shareholders are liable for the tax liability Tarcon incurred prior to the transfer.

This argument has some facial appeal. After all, should not a "transfer" under federal law be a "transfer" under state law? The answer, however, is "not necessarily"—because *Stern* tells us so. In *Stern*, as explained above, the Court assumed without deciding that the taxpayer's widow was a "transferee." After deciding that state law governed her substantive liability for her deceased husband's unpaid taxes, the Court turned to Kentucky law. Under Kentucky law, a defrauded creditor could only recover from a transferee in the widow's position if the insured had paid life insurance premiums "in fraud of creditors." 357 U.S. at 46. There was no evidence of

fraud, whether actual or constructive. Therefore, the Court held, the widow was not liable for her deceased husband's taxes, even assuming she was a "transferee" for § 6901 purposes.

Here, the Commissioner argues the Former Shareholders are substantively liable for Tarcon's unpaid taxes because there was a "transfer" of Tarcon's (all cash) assets to the Former Shareholders, and the transfer was fraudulent under North Carolina law. In *Stern*, the Supreme Court treated the alleged transferee's substantive liability as purely a question of state law. We must do the same here. As we suggest above, it may well be that the series of transfers on November 13-14 and December 1, 2003, in the aggregate, constitute a "transfer" for § 6901 purposes. But we need not and do not decide that question because, as explained *infra*, they do not constitute a single "transfer" for NCUFTA purposes.[8]

---

[8]The Commissioner places heavy reliance on *Lowndes v. United States*, 384 F.2d 635 (4th Cir. 1967), and *Owens v. Commissioner*, 568 F.2d 1233 (6th Cir. 1977), in support of his argument that federal law rather than state law governs whether to collapse the November 13-14 and December 1, 2003, transactions. *Lowndes* is unavailing, however, because it did not involve transferee liability pursuant to § 6901. In that case, a taxpayer had purchased all of the outstanding stock of four corporations, which were liquidated six months later. 384 F.2d at 636. The question was whether the taxpayer (1) received ordinary income at the time of the purchase, or (2) received income, taxable either as long term capital gain or as ordinary income, at the time of liquidation. *Id.* There was no question of transferee liability, and so *Stern* did not apply and the issue was one purely of federal law.

The reason *Owens* is distinguishable is a bit more complicated, but it is materially distinguishable nonetheless. Owens was the sole shareholder of an S corporation, Mid-Western, that had been involved in various ventures but by mid-1965 held only $299,822.62 in cash. 568 F.2d at 1236. In August 1965 he entered a contract purporting to sell Mid-Western's stock to two buyers for $262,842.26. *Id.* He reported his income from the sale as long-term capital gain. *Id.* Meanwhile, post-closing, the buyers, who apparently had planned to offset Mid-Western's 1964 gains with another corporation's losses, liquidated and dissolved Mid-Western. *Id.*

The question is thus: under North Carolina law, what transfer or combination of transfers should be considered to determine whether Tarcon received reasonably equivalent value and/or was rendered insolvent? Under the facts here, there are two options, depending on the time frame. The first option, the one advocated by the Former Shareholders and adopted by

---

The Commissioner issued two notices of deficiency against Owens. First, he asserted the 1965 transaction was in substance a distribution of Mid-Western's cash to Owens, not a bona fide sale of stock, and so Owens owed taxes on the company's 1965 S-corporation income—not capital gains taxes on the amount he received in the purported sale. *Id.* Second, the Commissioner asserted that (a) certain deductions Mid-Western had claimed for 1964 related to cattle feed were not allowable, (b) Owens was the transferee of Mid-Western's assets, and (c) as transferee Owens was liable for the 1964 deficiency. The Tax Court agreed with the Commissioner's theory on both notices. *Owens v. Comm'r*, 64 T.C. 1, 11-16 (1975).

The Sixth Circuit affirmed the Tax Court's decision on the first notice, agreeing that in substance Owens received a distribution of Mid-Western's assets, and that the distribution was taxable as ordinary S-corporation income, not the proceeds of a stock sale. *Owens*, 568 F.2d at 1240. As to the asserted 1964 deficiency—the deficiency involving asserted transferee liability—the court reversed, concluding the deduction *was* allowable. Because there was no deficiency, the court *did not reach* the question whether Owens was a "transferee" within the meaning of § 6901. *See id.* at 1246.

The Commissioner argues the facts here are analogous to those in *Owens*, and because in *Owens* the court re-characterized the purported stock sale as a distribution of the corporation's assets to the shareholder, we should do the same here. The portion of *Owens* the Commissioner relies upon, however, relates to the first notice of deficiency at issue in *Owens*—which did not involve § 6901 transferee liability. Rather, the issue was whether to treat the S corporation's 1965 income as having been distributed to the sole shareholder or retained by the corporation, an issue purely of federal law, at least in the circumstances there. While § 6901 transferee liability might have become relevant if the court had found the claimed 1964 deduction disallowable, the court did not so find; accordingly, the court had no occasion to consider the Supreme Court's instruction in *Stern* that state law governs an alleged transferee's substantive liability.

the Tax Court, is to consider only the transfers that occurred on November 13 and 14, 2003. During those two days, $3.1 million in cash was transferred from Tarcon to MidCoast's attorneys' escrow account and then back into a post-closing Tarcon account, and a separate and distinct $2.6 million in cash was transferred from MidCoast to the Former Shareholders, via the same escrow account. At the end of that period, Tarcon had $3.1 million in its account, the same amount it had prior to closing. The second option, the one advocated by the Commissioner, is to consider not only the November 13-14 transfers, but also the December 1 transfer of Tarcon's cash to the "Delta Trading Partners" account in the Cook Islands, after which Tarcon was left with just slightly more than $130,000 in its accounts.[9]

Which time frame applies is dispositive as to whether the transfers were fraudulent with respect to the Former Shareholders. On one hand, if the first, narrower combination of transfers is considered the "transfer" for NCUFTA purposes, Tarcon unquestionably received "reasonably equivalent

---

[9]The Commissioner also offers a third alternative time frame, one even shorter than the Former Shareholders' timeframe: He argues that the relevant "transaction" included only the transfers that occurred on November 13. At that time, Tarcon had no assets in its accounts, because instead of immediately transferring the cash in Womble Carlyle's escrow account to a Tarcon account, the closing attorney at Womble Carlyle transferred the cash first to a MidCoast account, and only the next day to a Tarcon account. This seems clearly to have been a mistake, however, despite the Commissioner's argument below that the mistake is evidence MidCoast intended to bleed Tarcon dry. Within 24 hours the error was corrected when MidCoast transferred the cash into Tarcon's account. The dissent argues in effect that because the Share Purchase Agreement did not "require" that Tarcon's cash be returned to Tarcon after the closing, Dissenting Op. at 48, the Tax Court committed clear error by finding that the one-day delay did not result in the funds being "unavailable" to Tarcon to satisfy its liabilities. *Starnes*, 101 T.C.M. (CCH) 1283, 2011 WL 894608, at *8. We disagree. There was substantial evidence that the Former Shareholders expected the funds to be transferred back to Tarcon, as of course they were within a day of the closing. We conclude the district court did not clearly err in this regard.

value" and was not rendered "insolvent as a result of the transfer." On the other hand, if the combination of transfers in this broader time frame constitutes the "transfer" for NCUFTA purposes, Tarcon unquestionably did *not* receive reasonably equivalent value in the exchange. This is because the December 1 transfer, in one fell swoop, took Tarcon from being fully able to meet its tax obligations to being entirely unable to do so.

The Tax Court held the shorter time frame controls because under North Carolina law the transactions are only "collapsed" if the Former Shareholders had actual or constructive "knowledge of the entire scheme," and the Commissioner did not prove, even by a preponderance standard (rather than the clear and convincing evidence standard urged by the Former Shareholders), that the Former Shareholders had actual or constructive knowledge of the later transactions. On appeal, the Commissioner argues the Tax Court erred in choosing the shorter timeframe, for two reasons: first, the court applied the wrong legal standard for whether to "collapse" the transactions, and second, the Tax Court's finding that the Former Shareholders lacked the requisite knowledge of the nature of the "entire scheme" to "collapse" the transactions was clearly erroneous. We reject the Commissioner's contentions for the reasons explained within.

i.

As to the legal standard, the Commissioner first argues the Tax Court required him to prove the Former Shareholders had "knowledge of the entire scheme," by which it allegedly meant evidence they knew "*the precise manner* in which Mid-Coast would cause Tarcon to evade its taxes." Appellant's Br. at 57 (emphasis added). This was legal error, the Commissioner argues, because North Carolina law does not require the Commissioner to prove that the Former Shareholders knew *precisely* how MidCoast would cause Tarcon to fail to pay its 2003 taxes.

As a literal matter, the Commissioner is correct as to the standard: the question was not whether the Former Shareholders knew precisely *how* Tarcon would become delinquent on its taxes under MidCoast's ownership, but rather whether they knew (or should have known) that Tarcon would become delinquent *in fact*. But the Commissioner over-reads the Tax Court's opinion. While the court did describe the standard as requiring knowledge of "the entire scheme," 101 T.C.M. (CCH) 1283, 2011 WL 894608, at \*10, in context it is apparent the court did not require the Commissioner to prove the Former Shareholders knew that MidCoast would, for example, claim a deduction for a purported interest rate swap option to offset the gain realized from the sale of the warehouse. Rather, the court required the Commissioner to prove simply that the Former Shareholders knew or should have known before the deal closed that MidCoast would cause Tarcon to fail to pay its 2003 taxes. This was the proper inquiry.[10]

---

[10]Our conclusion that the Tax Court applied the correct standard is buttressed by the primary case it cited for the "entire scheme" standard: *HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995). In that case, the Second Circuit held that because a mortgagee knew or should have known that the mortgage "was part of a single transaction from which [the mortgagor] received no benefit," the mortgagee was liable to the mortgagor's creditors under New York's version of the Uniform Fraudulent Conveyance Act, the predecessor to the Uniform Fraudulent Transfer Act. *Id.* at 629. Although elsewhere the *HBE Leasing* court described the standard as requiring "actual or constructive knowledge of *the entire scheme* that renders [the mortgagee's] exchange with the debtor fraudulent," *id.* at 635 (emphasis added), it did not require knowledge of the precise details of a particular scheme, but rather knowledge simply that no fair consideration was received in exchange for the mortgage. *See id.* at 629; *see also United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1296-97, 1303 (3d Cir. 1986) (collapsing, under Pennsylvania's analog to N. C. Gen. Stat. § 39-23.5(a), a series of transactions comprising a leveraged buy-out because the lender/mortgagee "knew or strongly suspected that the imposition of the loan obligations secured by the mortgages and guarantee mortgages would probably render [the debtor] insolvent" and "was fully aware that no individual member of the [debtor] would receive fair consideration within the meaning of the Act in exchange for the loan obligations").

The Commissioner next argues that, even if we conclude the Tax Court applied the narrower standard, the court erred in articulating the standard for whether the Former Shareholders should have known (i.e., had constructive knowledge) that MidCoast would cause Tarcon to fail to pay the taxes. We disagree on that score as well.

Under North Carolina law, the question of constructive knowledge has two components. As applied to the circumstances here, they are: First, did the Former Shareholders have actual knowledge of facts that would have led a reasonable person concerned about Tarcon's solvency to inquire further into MidCoast's post-closing plans? Second, if the Former Shareholders were thereby on "inquiry notice," whether the inquiry a reasonably diligent, similarly-situated person would have undertaken revealed MidCoast's plan to leave Tarcon unable to pay its 2003 taxes? *See, e.g.*, *Vail v. Vail*, 63 S.E.2d 202, 207-08 (N.C. 1951) ("[One] having notice must exercise ordinary care to ascertain the facts, and if he fails to investigate when put upon inquiry, he is chargeable with all the knowledge he would have acquired, had he made the necessary effort to learn the truth . . . .") (brackets added; quotations and citations omitted); *Nash v. Motorola Commc'ns & Elecs., Inc.*, 385 S.E.2d 537, 538 (N.C. Ct. App. 1989) ("Plaintiff will be deemed to have had inquiry notice if . . . he could have ascertained by a reasonably diligent effort from facts available to him that he was in violation."). Thus, if the Former Shareholders were on inquiry notice of MidCoast's plans and failed to make reasonably diligent inquiry, they are charged with the knowledge they would have acquired had they undertaken the reasonably diligent inquiry required by the known circumstances.

We are confident this is the standard the Tax Court applied. The court found the Commissioner satisfied his burden on prong one because it found that although the circumstances *did* oblige the Former Shareholders to conduct "[f]urther inquiry," they "failed to do so." *See* 101 T.C.M. (CCH) 1283,

2011 WL 894608, at *10. Nevertheless, the court ultimately found (as described below) the Former Shareholders were *not* chargeable with constructive knowledge of the MidCoast scheme. The opinion thus makes apparent the court's implied premise: that the Commissioner was required to prove that no reasonably diligent person in the Former Shareholders' position would have failed to discover that MidCoast would cause Tarcon not to pay its 2003 taxes. This was the correct standard under North Carolina law.

ii.

By imposing that standard and yet finding the Commissioner failed to satisfy his burden of proof on constructive knowledge, the Tax Court reasonably (if only implicitly) found that no reasonably diligent inquiry by the Former Shareholders would have disclosed MidCoast's intent to cause Tarcon to fail to pay its taxes. Put differently, even though the Former Shareholders might have conducted further inquiry, such a hypothetical effort would not likely have revealed MidCoast's post-closing plans to evade Tarcon's tax liability.

On appeal, the Commissioner argues these factual findings are clearly erroneous. He argues the Former Shareholders "knew or should have known that MidCoast had tax-avoidance intentions, even if they were not privy to the precise schemes that MidCoast would later employ to evade the taxes." Appellant's Br. at 57. While the Former Shareholders "claimed that they believed MidCoast's assertion that it was acquiring Tarcon to integrate the corporation into MidCoast's 'asset recovery business,'" the Commissioner argues, this belief "is doubtful" and, in any event, is "completely unreasonable." *Id.* at 58. The dissent shares the Commissioner's view that the lower court clearly erred in finding that the Former Shareholders lacked the requisite constructive knowledge.

The Commissioner vigorously argues the Former Shareholders should have known what 20/20 hindsight now seems to confirm, namely, that MidCoast had no purpose in acquiring Tarcon's stock "other than to facilitate a tax shelter." *Id.* The Commissioner identifies a number of reasons for this contention supported by the evidence: MidCoast's promotional materials stated it targeted corporations that held only cash and offered shareholders a way to minimize their tax burden; MidCoast's offer to buy Tarcon's stock was contingent on Tarcon holding only cash; the negotiations revolved largely around the percentage of the amount of Tarcon's 2003 taxes that MidCoast would pay the Former Shareholders as a "premium," which ended up as approximately $400,000; and Tarcon was a defunct shell with no means to generate additional income.

Moreover, the Commissioner emphasizes, the Former Shareholders' inquiry was not reasonably diligent: they did not investigate MidCoast's asset recovery business; they did not obtain a tax opinion regarding the stock sale; Naples acknowledged that paying cash for a corporation that held only cash "did sound strange," J.A. 759; another Former Shareholder (Starnes) testified that although he did not understand MidCoast's promotional materials, "[i]t wasn't something I wanted to understand," and "[o]nce they bought my stock, they could do what they wanted to with Tarcon," J.A. 824; Starnes also testified that once Tarcon's cash left the corporate bank account, "we didn't follow it any more, because we didn't own the company any more," J.A. 823; Stroupe asked at the closing whether the MidCoast deal was "completely legal," J.A. 801; and the Former Shareholders' accountant questioned whether the sale was "'2001-16' reportable," J.A. 601-03, but failed to confirm whether it was or was not covered by I.R.S. Notice 2001-16. Finally, the Commissioner argues, "[r]easonable inquiry would have, at least, disclosed the existence of Notice 2001-16," which would have "explicitly cautioned the Shareholders that their transaction with MidCoast was substantially similar to other

intermediary transactions considered to be tax shelters."
Appellant's Br. at 61.

This evidence certainly supports the Commissioner's position in this litigation. But they do not persuade us that the Tax Court was clearly erroneous in finding that, under the circumstances shown by the evidence, the Former Shareholders lacked constructive knowledge that Tarcon was unlikely to pay its 2003 taxes. To the contrary, there was ample countervailing evidence to that relied on by the Commissioner supporting the lower court's finding that the admittedly limited inquiry by the Former Shareholders did little to bolster the Commissioner's case. Properly viewed, as we suggest above, the Tax Court clearly found that the Former Shareholders would not have learned through further inquiry so much more of MidCoast's intentions to justify the court's imposition of constructive knowledge.

MidCoast represented that Tarcon would not be "dissolved or consolidated" but rather "reengineered into the asset recovery business" and become an "income producer" for MidCoast "going forward." J.A. 104. It also repeatedly represented that it would ensure that Tarcon would pay its 2003 taxes. MidCoast's professional-looking brochure stated that MidCoast was a well-established business that was incorporated in 1958 and in 1996 transitioned from mortgage banking to asset recovery, mostly collecting defaulted credit card debts. At every turn, MidCoast represented that Tarcon would continue to operate as a business, and that Tarcon would pay its 2003 taxes.

There is still further evidence the Former Shareholders' efforts to ascertain MidCoast's post-closing plans were reasonable as measured against the hypothetical, "reasonably diligent" efforts North Carolina law contemplates. Joseph Cogdell, MidCoast's attorney who also served as the closing attorney for the stock sale, testified that he had no reason to believe MidCoast would fail to abide by its contractual obli-

gation to ensure Tarcon's 2003 taxes would be paid. At the time of the transaction, he was a senior member of the corporate and securities practice group at Womble Carlyle, held an L.L.M. in taxation, and was intimately familiar with the details of the transaction. Similarly, Brad Cherry, Tarcon's real estate broker, testified that MidCoast's representatives struck him as ordinary businessmen, and nothing in Mid-Coast's proposals raised any concern with him.[11] He also checked MidCoast's references and apparently received very positive feedback, and reported to the Former Shareholders that MidCoast was a "reputable firm." J.A. 785. Moreover, Michael Cronin, Esq., Tarcon's attorney at the law firm Moore & Van Allen, also was familiar with the transaction and never saw any reason the Former Shareholders should not enter the transaction with MidCoast. And when the Former Shareholders asked Cherry and their attorneys whether the deal was legitimate, they were told that it was, and that Mid-Coast had "done these [deals] before." J.A. 801. These conversations led the Former Shareholders to be "confident" that the deal was "legitimate" and "completely legal." J.A. 725, 801.

Furthermore, the Tax Court was entitled to weigh other circumstantial evidence bearing on the issues of "reasonable diligence" and constructive knowledge. Specifically, although the Former Shareholders had substantial experience in the freight consolidation business and some warehouse leasing experi-

---

[11]Indeed, Cherry was appropriately circumspect throughout, writing as follows to the Former Shareholders when he received MidCoast's initial communication:

> [I]t appears that this is something that they do often, but also something in which I am definitely out of my league. I would like to encourage you, when the time is appropriate, to involve both your accountant and a lawyer to help advise us through this transaction should it move forward.

101 T.C.M. (CCH) 1283, 2011 WL 894608, at *2. Obviously, the Former Shareholders acted on this sage advice.

ence, none had ever sold a business before, and none had any education, training, or experience in accounting, taxes, or finance. Naples and Starnes each had a high school education; Morelli a ninth-grade education. They each worked at Tarcon for all or nearly all of their adult lives—Morelli began assisting on the docks, Starnes as a janitor. In sum, the Tax Court could reasonably find, as it essentially did, that the Former Shareholders learned what any reasonably diligent inquiry would have disclosed to any similarly situated group of persons through their reliance on their advisors and agents.

For these reasons, we conclude the Tax Court did not commit clear error in finding that the Commissioner failed to prove that a reasonably diligent person in the Former Shareholders' position would have learned that, as a result of the transaction, Tarcon would fail to pay its 2003 taxes. Given that factual finding, the Commissioner failed to prove that the December 1 transfer—which rendered Tarcon essentially insolvent and unable to satisfy its 2003 tax liability—should be collapsed with the earlier transfers for purposes of determining whether Tarcon received "reasonably equivalent value" in the "transfer," as required by N.C. Gen. Stat. § 39-23.5.[12] Because the transfers were not collapsible under North Carolina law, they were not fraudulent under § 39-23.5 with respect to the Former Shareholders. Accordingly, the Tax Court properly held that § 39-23.5 does not provide a basis for holding the Former Shareholders liable for Tarcon's 2003 tax liability.

---

[12]For the same reason, we reject the Commissioner's argument that the Tax Court clearly erred in finding there was no "circular flow of funds." *See* Appellant's Br. at 62-65; *see also* n.5, *supra*. The Commissioner's clear-error argument on that point also boils down to an argument that the December 1 transfer should have been collapsed with the earlier transfers. Because the Tax Court did not clearly err in refusing to collapse the transactions, it did not clearly err in finding there was no circular flow of funds.

2.

The next NCUFTA provision the Commissioner argues rendered fraudulent the transfer of Tarcon's assets as to the Former Shareholders is N.C. Gen. Stat. § 39-23.4(a)(2). Under that subsection, a "transfer" made by a debtor "is fraudulent as to a creditor" if the debtor (1) made the transfer "without receiving a reasonably equivalent value in exchange," and (2) was engaged in a transaction for which its "remaining assets" were "unreasonably small," or intended to incur "debts beyond the debtor's ability to pay." *Id.* As explained in the preceding section, the Commissioner failed to prove the December 1 transfer should be collapsed with the November 13-14 transfers for NCUFTA purposes. Thus, just as under § 39-23.5, the Commissioner failed to prove Tarcon did not receive "reasonably equivalent value" for its cash. Accordingly, § 39-23.4(a)(2) does not provide a basis for holding the Former Shareholders liable as transferees for Tarcon's 2003 taxes.

3.

The third and last NCUFTA subsection the Commissioner relies upon is N.C. Gen. Stat. § 39-23.4(a)(1). That subsection provides that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer "[w]ith intent to hinder, delay, or defraud any creditor of the debtor." *Id.* The statute provides thirteen non-exclusive "factors" for determining whether a debtor had the requisite fraudulent intent. The Tax Court considered seven of them relevant to the facts here:

    (1)   The transfer or obligation was to an insider;
           . . .

    (5)   The transfer was of substantially all the debtor's assets; . . .

    (7)   The debtor removed or concealed assets;

(8)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)   The transfer occurred shortly before or shortly after a substantial debt was incurred; . . .

(12)   The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due[.]

*Id.* § 23.4(b).[13]

---

[13]The other factors are the following:

(2)    The debtor retained possession or control of the property transferred after the transfer;

(3)    The transfer or obligation was disclosed or concealed;

(4)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; . . .

(6)    The debtor absconded; . . .

(11)   The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor; . . .

(13)   The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b).

The Tax Court weighed these factors and held that the Commissioner had not shown that the Shareholders intended to hinder, delay, or defraud the IRS, which was, after all, Tarcon's only creditor at the time. Crucial to its analysis was its rejection of the Commissioner's argument for collapsing the November 13-14 and December 1 transfers, a conclusion we affirm for the reasons explained above. Because the relevant time frame is limited to November 13-14, the transfer was not of substantially all of Tarcon's assets (factor 5); Tarcon did not remove or conceal assets (factor 7); the value of the consideration Tarcon received was "reasonably equivalent to the value of the asset transferred" (factor 8); Tarcon was not rendered insolvent (factor 9); and Tarcon did not make the transfer "without receiving a reasonably equivalent value in exchange" (factor 12). Thus, although the Former Shareholders were "insiders" (factor 1) and the transfers occurred shortly after a substantial debt, namely the tax liability on the warehouse sale, was incurred (factor 10), the Tax Court concluded the Commissioner had not shown that the Former Shareholders intended to "hinder, delay, or defraud" the IRS from collecting Tarcon's 2003 taxes.

On appeal, the Commissioner argues the Tax Court erred in applying these factors for largely the same reason the court erred on the other claims: by requiring evidence of actual or constructive knowledge that Tarcon would be rendered insolvent by the transaction. For the reasons stated above, that was not legal error. And the Tax Court did not clearly err in making the factual findings underlying the conclusion that the Former Shareholders did not intend to hinder, delay, or defraud the IRS from collecting Tarcon's 2003 taxes. Therefore, the Commissioner has failed to show that § 39-23.4(a)(1) renders the Former Shareholders liable for Tarcon's 2003 taxes.

4.

Lastly, the Commissioner argues the Former Shareholders are liable to Tarcon's creditors under the common law "trust

fund doctrine." This doctrine treats the assets of a corporation as, "in a sense, . . . a trust fund," and the corporation's officers and directors as "occupy[ing] a fiduciary position in respect to stockholders and creditors, which charges them with the preservation and proper distribution of those assets." *Snyder v. Freeman*, 266 S.E.2d 593, 601 (N.C. 1980). "The corporate debts must be paid before [officers and directors] can appropriate any part of the assets to their own use, though they may also be stockholders." *McIver v. Young Hardware Co.*, 57 S.E. 169, 171 (N.C. 1907). "[T]he stockholders and officers of the corporation are liable to it and to its creditors for any acts of malfeasance, misfeasance, or nonfeasance by which their rights are injuriously affected, and, as a consequence, for any loss arising out of their fraud or negligence." *Id.*

The Tax Court rejected this argument because (1) as a legal matter, the trust-fund doctrine only applies "where circumstances exist 'amounting to a winding-up or dissolution of the corporation,'" *Starnes*, 101 T.C.M. (CCH) 1283, 2011 WL 894608, at *13 (quoting *Whitley v. Carolina Clinic, Inc.*, 455 S.E.2d 896, 899–900 (N.C. Ct. App. 1995)), and (2) as a factual matter, the Commissioner "has not presented evidence regarding circumstances that existed amounting to a winding up or dissolution of Tarcon aside from claiming that Tarcon no longer had a business activity." *Id.*

On appeal, the Commissioner does not dispute the Tax Court's characterization of North Carolina law, limiting the trust-fund doctrine to the dissolution context. Rather, the Commissioner argues the court's finding that Tarcon was not in dissolution was clearly erroneous. We disagree. At the time the Former Shareholders entered the transaction, MidCoast's representatives assured them that Tarcon would remain a going concern and would be absorbed into MidCoast's "asset recovery" business. Indeed, Tarcon did remain in existence long past the time MidCoast bought its stock. Just as it was not clearly erroneous to find that the Former Shareholders did not know the transaction would leave Tarcon insolvent, it was

not clearly erroneous to find that the transaction did not amount to a winding up or dissolution of the company.

## III.

As we have explained at length, the Commissioner's efforts to collect Tarcon's unpaid 2003 taxes from the Former Shareholders foundered on his inability to persuade the Tax Court that the Former Shareholders knew or should have known that Tarcon would fail to pay its taxes under its new owner. The Commissioner argues, as a policy matter, that requiring that he prove actual or constructive knowledge "imposes an impossible burden on [him] in intermediary tax shelter cases" and "enables participants in an intermediary tax shelter to easily defeat transferee liability, by choosing willful blindness of the promoter's tax-avoidance intentions and then claiming ignorance of the 'entire scheme.'" Appellant's Br. at 54-55.

Although we are not unsympathetic to the Commissioner's concerns, his policy argument is foreclosed by existing law for the reasons discussed above. It is also overblown. North Carolina law, like the law of other states that have adopted the Uniform Fraudulent Transfer Act, requires neither evidence of actual intent to defraud nor direct evidence of alleged transferees' knowledge. The Commissioner could have prevailed based solely on circumstantial evidence that the Former Shareholders should have known of MidCoast's intentions. That the Commissioner could not persuade the Tax Court does not mean his burden was insurmountable; it simply means his evidence was insufficient to persuade the fact finder in this case.[14] Furthermore, as noted above, the IRS

[14]Indeed, with evidence of a more persuasive character, or with historical facts more compelling, the Commissioner has prevailed before the Tax Court in other transferee liability cases involving MidCoast. *See, e.g.*, *Feldman v. Commissioner*, 102 T.C.M. (CCH) 612, 2011 WL 6781006 (2011); *CHC Industries, Inc. v. Commissioner*, 101 T.C.M. (CCH) 1148, 2011 WL 320887 (2011). In each such case, as in this case, the primacy

itself has recognized that a person should only be held liable in intermediary transaction tax shelter cases if he or she knew or had reason to know that the transaction was structured to avoid federal taxes due on assets with built-in gains. *See* n.3, *supra* (citing I.R.S. Notice 2008-111).

Ultimately, as the Commissioner had the burden of proof on the dispositive issues, his "clear error" contentions before us really amount in substance to an argument that he is entitled to judgment as a matter of law, i.e., that the evidence of the Former Shareholders' foreknowledge of the MidCoast scheme was so one-sided that no reasonable decision-maker could reasonably rule in their favor. Manifestly, for the reasons we have explained, this is not so. Therefore, we affirm the judgment of the Tax Court in favor of the Former Shareholders.

*AFFIRMED*

WYNN, Circuit Judge, dissenting:

This case involves a straightforward transaction made complicated so as to facilitate the fraudulent avoidance of a tax liability. Simply put, the petitioners, former shareholders of Tarcon, reduced the sole asset of Tarcon to cash by selling that asset, a warehouse, for $3,180,000. After that October 30, 2003 sale, Tarcon had $3,091,955 in its bank account and no

---

of the Tax Court's role as fact finder is, of course, undisputed. To paraphrase the Supreme Court's statement of the principle in an analogous context, "the trial court's decision on the ultimate question of [fraudulent] intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York*, 500 U.S. 352, 364 (1991) (plurality opinion). Application of that principle here means that although there may have been some evidence of what the Commissioner calls "willful blindness," it was for the Tax Court, not this court, to make findings based on that evidence, and we are obliged to accord those findings "great deference." *Id.*

tangible assets. As a result of the warehouse sale, Tarcon incurred a federal tax liability of $733,699 and a North Carolina tax liability of $147,931, for a total of $881,628. If the story had ended there, the four former shareholders, each of whom owned 25 percent of Tarcon, would have completed the liquidation of Tarcon by paying those tax liabilities and dividing the remaining sum, allowing each to receive a distribution of approximately $552,582.

Of course, the story doesn't end there. Instead, MidCoast entered with a fraudulent scheme that would allow the former shareholders to avoid paying their $881,628 tax liability. Under its proposal, MidCoast would pay the former shareholders $2,621,136 for their Tarcon stock and legal fees; in return, Tarcon would transfer its sole asset, roughly $3.1 million in cash, to MidCoast. Why, though, would the shareholders turn over Tarcon's $3.1 million to MidCoast and receive only $2.6 million in return?

The answer is evident when Tarcon's outstanding tax liabilities of $881,627 are factored into the equation. Indeed, it then becomes clear that the former shareholders actually negotiated to be paid $2.6 million in cash—for cash that in reality totaled only $2,210,425,[1] resulting in a windfall of $410,711. That windfall was, in fact, a cut from Tarcon's $881,627 tax liability, transferred to MidCoast when it purchased the former shareholders' stock, and which it undoubtedly was scheming to avoid under the guise of offering an "asset recovery premium." While I recognize the intricacies of MidCoast's subsequent actions to avoid paying the full liability of $881,627,[2] this transaction cannot escape its ultimately simple

---

[1]Tarcon's $3.1 million in cash, less its tax liabilities of $881,627, equals $2,210,425 in cash—the true value of Tarcon's assets.

[2]The record reflects that less than two weeks after MidCoast purchased Tarcon's stock from the former shareholders, it resold the stock to Sequoia Capital, LLC, a Bermuda company, for approximately $2.8 million. Two days after that, the $3.1 million in Tarcon's account was transferred to

label: a transparent scam designed by the parties to fraudulently evade paying taxes. Accordingly, I must respectfully dissent.

## I.

This is a case about transferee liability under 26 U.S.C. § 6901. As such, I take issue with the majority's conclusion that it need not address the threshold question of whether the former shareholders are in fact transferees. The majority dismisses as "immaterial," *ante* at 20, what I view as a critical analytical difference between the substantive state law in Kentucky at issue in *Commissioner v. Stern,* 357 U.S. 39 (1958), and the North Carolina Uniform Fraudulent Transfer Act (NCUFTA), N.C. Gen. Stat. § 39-23.1 *et seq.*, that controls in this case.

In *Stern*, the question of whether the beneficiary widow was a transferee was irrelevant under Kentucky law, as she would not have been liable in *either* instance for her deceased husband's unpaid income tax deficiencies. *Stern*, 357 U.S. at 45-46. In this case, by contrast, and as noted by the majority opinion, North Carolina law may indeed impose liability on the former shareholders, but *only if* there was a fraudulent transfer *and* they are transferees under federal law. *See, e.g.*, N.C. Gen. Stat. §§ 39-23.4, 39-23.5 (voiding certain types of

---

another account, also in Tarcon's name, with Deutsche Bank AG. On December 1, 2003, over $2.9 million of those funds was transferred to an account in the Cook Islands in the name of Delta Trading Partners, and an additional $126,822 was transferred to a MidCoast bank account.

After that date, Tarcon never had more than $132,320 in any bank account. When the company filed its 2003 federal income tax return, it reported an overall loss and no tax due, based on losses from a purported interest rate swap option and an asset acquired on December 29 and sold on December 31, 2003, offsetting the gains from the sale of the warehouse to ProLogis. The return also stated that the $132,320 represented Tarcon's sole asset.

transfers as fraudulent, which under § 6901 would in turn allow for the imposition of substantive liability on the transferees in such transactions).

Equally significant, the question of whether the former shareholders are transferees is inextricably linked with, and informed by, *which* transaction is under review. In another significant distinction from *Stern*, there was no dispute in that case that a transfer from the original taxpayer to the beneficiary widow had occurred; here, however, depending on which transaction is considered, there was no transfer from Tarcon, the debtor owing taxes. Put another way, for § 6901 and *Stern* to apply and North Carolina law to determine the former shareholders' liability, the former shareholders must be transferees—but they are only transferees if they received a "transfer" as part of the transaction under review.

Notwithstanding these material distinctions, the majority opinion, relying on *Stern*, assumes *arguendo* that the former shareholders are transferees—but then proceeds to analyze the stock sale between MidCoast and the former shareholders as the sole transaction relevant under North Carolina law. The problem, of course, is that the "form" of that transaction was structured such that the former shareholders received Tarcon's assets only indirectly: there was no direct "transfer" between Tarcon and the former shareholders. As such, the majority reviews a transaction in which the former shareholders are not actually transferees, while assuming that they are, an internal inconsistency in which I cannot concur.[3]

---

[3]The majority opinion disputes the contention that § 6901 requires courts to determine, when it may not be properly assumed, the threshold issue of whether a person or entity is a "transferee" under federal law for the purposes of § 6901. According to the majority opinion, this question must be answered—if at all—by reference to state substantive law. However, if this is the case, why then is "transferee" specifically defined by federal law to include a "donee, heir, legatee, devisee, and distributee." 26 U.S.C. § 6901(h). A logical application of the majority opinion would allow state substantive law to redefine, for instance, donees and heirs as something other than potential transferees in clear contravention of § 6901(h).

II.

In my view, the Tax Court and this Court must make the threshold determination of which transaction is properly under review, which in turn informs the dispositive issue here of whether the former shareholders are properly characterized as transferees under § 6901. *See generally Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978) ("The general characterization of a transaction for tax purposes is a question of law subject to review."); *Va. Historic Tax Credit Fund 2001 LP v. Comm'r of Internal Revenue*, 639 F.3d 129, 142 (4th Cir. 2011) (same).

A.

To answer that initial question, I look to this Court's precedent:

> A taxpayer may not . . . claim tax benefits that Congress did not intend to confer by setting up a sham transaction lacking any legitimate business purpose, or by affixing labels to its transactions that do not accurately reflect their true nature. Accordingly, under the "economic substance doctrine," a transaction may be disregarded as a sham for tax purposes if the taxpayer "was motivated by no business purposes other than obtaining tax benefits" and "the transaction has no economic substance because no reasonable possibility of a profit exists." *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir. 1985). Similarly, the doctrine of "substance over form" recognizes that the substance of a transaction, rather than its form, governs for tax purposes. *See, e.g.*, *W. Va. N. R.R. Co. v. Comm'r*, 282 F.2d 63, 65 (4th Cir. 1960) ("It is well settled that in matters of taxation substance rather than form prevails and that the taxability of a transaction is determined by its

true nature rather than by the name which the parties may use in describing it.").

*BB&T Corp. v. United States*, 523 F.3d 461, 471 (4th Cir. 2008).[4] We have further instructed that "[i]n applying the doctrine of substance over form, we 'look to the objective economic realities of a transaction rather than to the particular form the parties employed.'" *Id.* at 472 (quoting *Frank Lyon*, 435 U.S. at 573 (alteration omitted)).

Here, the "objective economic realities" establish that the former shareholders effectively wound up Tarcon and received liquidating distributions of its cash as a result of the stock sale to MidCoast. As noted in the Tax Court's Memorandum, it is undisputed that "[b]y 2003, Tarcon was no longer in the freight consolidation business, and its primary business was leasing warehouse space" at a property in Charlotte.[5] *Starnes v. Comm'r of Internal Revenue*, T.C. Memo 2011-63. 2011 WL 894608, *1 (2011). Thus, the transaction to sell the warehouse to ProLogis reduced all of Tarcon's assets to cash, with no apparent plan to use those monies to commence another business activity. The Share Purchase Agreement also explicitly acknowledged that "[i]mmediately prior to the Closing and at Closing, the Company shall possess assets consisting of cash in an amount not less than the sum of $3,092,052.54, and the Company shall be subject to no

---

[4]Although federal law generally controls which transaction gives rise to the original debtor's federal tax liability, I note that North Carolina also incorporates substance-over-form principles in its fraudulent-conveyance law. *See* N.C. Gen. Stat. § 39-23.1(12) & N.C. Comment (defining "transfer" for NCUFTA purposes as "every mode, direct or indirect . . . of disposing of or parting with an asset"); *Havee v. Belk*, 775 F.2d 1209, 1219 (4th Cir. 1985) (holding that substance of a transaction, not its form, governs for NCUFTA).

[5]During the relevant time period, this warehouse was Tarcon's sole remaining asset; other assets including a number of luxury cars and a condominium were either sold prior to the transactions at issue or are otherwise immaterial to the analysis.

Liabilities other than the Deferred Tax Liability" of $881,627.74. J.A. 249.[6] By their own admission, the former shareholders had decided to retire and sell either Tarcon's assets or its stock, effectively liquidating the company.

However, after being contacted by MidCoast, the former shareholders agreed to sell their stock directly to MidCoast. This decision was surely driven by MidCoast's representations, as outlined in the majority opinion, that "[w]ith a liquidation, the Former Shareholders would effectively be taxed twice," whereas "[w]ith a stock sale, they would only be taxed once." *Ante* at 7. Indeed, it is undisputed that "negotiations *primarily focused* on the percentage applied to the tax liabilities to determine the share purchase price."[7] *Starnes*, T.C. Memo 2011-63, 2011 WL 894608, at *3 (emphasis added).

Even more telling, the Share Purchase Agreement included the condition that "*[t]he Company . . . deliver( ) to [Mid-Coast] . . . all of the Company's monies by wire transfer . . . in the amount of*" $3,092,052.54. J.A. 249 (emphasis added). There was no discernible "legitimate business purpose" for this transfer of Tarcon's cash to MidCoast; at closing, Mid-Coast already had complete control over all of Tarcon's assets and accounts by virtue of its ownership of all of Tarcon's shares.

Based on these objective realities—and despite its "form"—the sale to MidCoast was not a true sale of stock. Rather, the "substance" of the transaction reflects that the purported sale was no more than a cash-for-cash swap in which

---

[6]Citations to the joint appendix are abbreviated as "J.A."

[7]This so-called "asset recovery premium," in which MidCoast paid the shareholders 43.75 percent of Tarcon's deferred tax liability, explains why the former shareholders would enter into the Share Purchase Agreement at all, rather than simply divide and distribute Tarcon's $3.1 million in cash, less the $881,627 in tax liability. Described less charitably, the "asset recovery premium" sounds quite a bit like a scheme not only to avoid paying taxes, but to profit while doing so.

the former shareholders received MidCoast's $2.6 million in exchange for transferring Tarcon's $3.1 million. Because cash is fungible, this exchange is no different in substance than if the former shareholders had received outright distributions of Tarcon's cash. *See Owens v. Comm'r of Internal Revenue*, 568 F.2d 1233, 1239 (6th Cir. 1977) (explaining that "when a corporation owns just cash . . . the corporation has already been effectively liquidated[.]"); *Lowndes v. United States*, 384 F.2d 635 (4th Cir. 1967) (disregarding a purported sale of stock in four subsidiaries of Bethlehem Steel Company that had ceased operating and held only cash). In *Owens*, the Sixth Circuit explained that:

> In view of these circumstances of the sale, . . . [the purchasers] did not assume the risks of a business. What taxpayer actually sold . . . was the right to distribute a quantity of cash to themselves. Moreover, that right to a distribution of cash was in substance no different than the cash that taxpayer received for the stock. Exclusive control of [the company] was transferred to [the purchasers]. There were no obstacles to the immediate withdrawal of the cash in [the company's] bank account. [The purchasers] were given the right to draw on the [company's] bank account in return for taxpayer being given the right to draw on [the purchaser's] bank account. The parties were simply exchanging cash.

568 F.2d at 1240 (internal citations omitted). This type of exchange of cash, which "does not affect a taxpayer's beneficial interest," "serve[s] no other purpose than tax avoidance." *Id.* (citing *Haberman Farms, Inc. v. United States*, 305 F.2d 787 (8th Cir. 1962)); *see also Rice's Toyota World, Inc. v. Comm'r of Internal Revenue*, 752 F.2d 89, 91 (4th Cir. 1985) (holding that the form of a transaction may be disregarded as a sham for tax purposes if the taxpayer "was motivated by no business purposes other than obtaining tax benefits").

## B.

Having determined that the relevant transaction for review is not the stock sale, but the effective liquidation of Tarcon, the next issue for consideration is whether, with respect to that transaction, the former shareholders are "transferees" within the meaning of § 6901. If they are, then North Carolina law applies to determine the "existence and extent" of their liability. *Stern*, 357 U.S. at 45.

Under § 6901, a "transferee of property" is liable for income taxes "in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred" by the taxpayer. 26 U.S.C. § 6901(a). A "transferee" is further defined as including a "donee, heir, legatee, devisee, and distributee." *Id.* § 6901(h). Again, because cash is fungible, the former shareholders effectively received distributions of Tarcon's assets during liquidation, with MidCoast as a mere conduit. As such, the former shareholders meet the definition of "transferees."

Moreover, because the Share Purchase Agreement did not require that Tarcon get anything in return for its $3.1 million, this transfer was plainly fraudulent under North Carolina law, as it cannot fairly be said that it "receiv[ed] a reasonably equivalent value in exchange for the transfer." N.C. Gen. Stat. § 39-23.5(a); *In re Jeffrey Bigelow Design Grp. Inc.*, 956 F.2d 479, 484 (4th Cir. 1992) ("What constitutes reasonably equivalent value is determined from the standpoint of the debtor's creditors." (quotation and citation omitted)). Moreover, until MidCoast voluntarily moved the $3.1 million back into a new Tarcon account the following day, Tarcon did, albeit temporarily, "bec[o]me insolvent as a result of the transfer." N.C. Gen. Stat. § 39-23.5(a).

The majority opinion dismissively refers to the transfer from Tarcon to MidCoast as an "apparent mistake" and a temporary "detour" of Tarcon's cash, *ante* at 11, apparently

because, *although the $3.1 million was initially transferred into MidCoast's account*, it was returned to Tarcon's post-closing account *the next day*, per the closing statement. Not-withstanding what the closing statement may have said or what happened the next day, it is undisputed that the Share Purchase Agreement required only that Tarcon to deliver *all of its cash* to the trust account of MidCoast's attorneys.[8] As a result, the critical transfer here was from Tarcon to Mid-coast, with nothing required to be returned to Tarcon under the express terms of the Share Purchase Agreement.

Even if one assumes, as the majority does, that MidCoast was required to transfer the $3.1 million back to Tarcon, such that Tarcon did receive value, the transfer from MidCoast to the shareholders must also be voided as fraudulent under North Carolina law, and the former shareholders would like-wise be liable as transferees. Under that approach, because MidCoast became the debtor when it assumed Tarcon's tax liabilities by purchasing all of its outstanding shares of stock, its transfer of $2.6 million to the former sharehold-ers—including the "asset recovery premium"—was made with "intent to hinder, delay, or defraud" the IRS.[9] N.C. Gen. Stat. § 39-23.4(a)(1). In other words, the former shareholders would be liable as "transferees of transferees," as Tarcon transferred its liabilities to MidCoast, and MidCoast in turn

---

[8]Indeed, the movement of Tarcon's cash—from a Tarcon account, to a MidCoast account, back to a Tarcon account—is strongly suggestive of MidCoast's leveraging those funds to finance its payment to the former shareholders. At the least, it calls into question whether the Tax Court was correct in its determination that this deal did not involve a circular flow of funds.

[9]This "intent to hinder" is illustrated by the realities that: (a) the shares of stock received by MidCoast, with an actual value of only $2.2 million, cannot fairly be said to be "reasonably equivalent" to the $2.6 million that was paid; and (b) by paying the "asset recovery premium" to the share-holders, MidCoast reduced its ability to pay Tarcon's tax liability. *See* N.C. Gen. Stat. § 39-23.4(b)(1) (outlining factors that would show "intent" under the previous section).

transferred cash to the former shareholders. *See Butler v. Nationsbank, N.A.*, 58 F.3d 1022, 1026-28 (4th Cir. 1995) (finding that indirect transfer was a fraudulent conveyance under predecessor law to NCUFTA).

## III.

The record here shows that the former shareholders did not understand what was meant by the "asset recovery business" or what MidCoast actually planned to do with Tarcon, yet they made no inquiries in part because "it wasn't something [they] wanted to understand," and MidCoast could do what it wanted with Tarcon once they were paid for their stock. J.A. 824. Faced with a windfall of over $410,000, the former shareholders' willful blindness is somewhat understand-able—but it cannot be allowed to stand, lest this type of sham transaction to avoid paying federal taxes becomes a standard business practice.

When the substance, rather than the form, of these transactions is properly reviewed, it becomes clear that the deal in question was nothing more than a new, more sophisticated version of money laundering. Because I find that the "economic realities" here amounted in substance to a distribution of Tarcon's cash, less only roughly half of its deferred tax liabilities, to the former shareholders, with a facilitation fee paid to MidCoast, I would reverse the Tax Court and find the former shareholders liable as transferees under § 6901 and North Carolina law. Accordingly, I respectfully dissent.