T.C. Memo. 2016-119

UNITED STATES TAX COURT

ESTATE OF RICHARD L. MARSHALL, DECEASED, PATSY L. MARSHALL,
PERSONAL REPRESENTATIVE, AND PATSY L. MARSHALL,
TRANSFEREES, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27241-11, 28661-11,          Filed June 20, 2016.
            28782-11.

Robert J. Chicoine, Christopher R. Chicoine, and David B. Bukey, for

petitioners.

Melanie E. Senick, William D. Richard, Patsy A. Clarke, and Gregory

Michael Hahn, for respondent.

---

[1]Cases of the following petitioners are consolidated herewith:  Marshall
Associated, LLC, Transferee, docket No. 28661-11; and John M. Marshall and
Karen M. Marshall, Transferees, docket No. 28782-11.

**[*2]**            MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In these three consolidated transferee liability cases the Government seeks to collect from petitioners, as transferees, Federal income tax of $15,482,046 and a penalty of $6,192,818 assessed against First Associated Contractors, Inc., formerly known as Marshall Associated Contractors, Inc. (MAC), for its fiscal year ending (FYE) March 31, 2003.[2]  On March 7, 2003, MAC entered into a complex set of agreements which resulted in all or substantially all of its assets' being transferred to Richard Marshall (Richard), Patsy Marshall (Patsy), John Marshall (John), and Karen Marshall (Karen) (collectively Marshalls) and Marshall Associated, LLC (MA LLC), an Oregon limited liability company wholly owned by the Marshalls (MAC transaction).

The issue for decision is whether petitioners are liable as transferees under section 6901 for MAC's unpaid Federal income tax liability, penalty, and interest.[3]  For the reasons stated herein, we find that petitioners are liable.

---

[2]All dollar amounts are rounded to the nearest dollar.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3]                                    FINDINGS OF FACT

The Marshalls were residents of Oregon at the time they filed petitions, and MA LLC's principal place of business was in Oregon at all relevant times. Richard, Patsy, John, and Karen each owned 25% of MAC. MAC was incorporated in 1965 under the laws of the State of Oregon as a C corporation, where it also had its principal place of business. John and Richard were brothers. Richard and Patsy were married, as were John and Karen, for all relevant periods. Richard Marshall died on October 29, 2013.

Beginning in 1965 MAC operated as a construction contractor specializing in heavy construction, including sewer and water pipe installation. Richard was responsible for MAC's business operations. His duties included managing MAC's finances and doing most of MAC's bidding on construction projects. John was responsible for MAC's field operations. His duties included assembling crews for MAC's construction projects and overseeing the construction worksites.

U.S. Bureau of Reclamation Work and Subsequent Litigation

In 1982 MAC entered into a contract with the U.S. Bureau of Reclamation (US BOR) to supply approximately 1,061,400 cubic yards of sand and coarse aggregate for the construction of the Upper Stillwater Dam in central Utah (Stillwater project), which MAC completed. Construction of the dam was to begin

[*4] in 1983.  In or about 1983 MAC entered into a contract with the US BOR to build a two-lane road in the mountains near Thistle, Utah (Sheep Creek project).  In 1984 Union Bank of California (UBOC) lent $2 million to MAC for the Stillwater project.  Richard and John personally guaranteed the UBOC loan to MAC.

A contract dispute arose regarding the Stillwater project and the contract was terminated.  MAC filed a claim for equitable adjustment, which was denied, and subsequently appealed in 1984 (Stillwater appeal).  Another contract dispute arose regarding the Sheep Creek project, and MAC subsequently filed a claim for additional compensation in 1984 following completion of the project.  This claim was also denied, and MAC appealed (Sheep Creek appeal).  The Marshalls and US BOR agreed to resolve the Stillwater appeal before addressing the Sheep Creek appeal.

In 1999 Richard suffered a stroke that left him with hemiparalysis, difficulty moving one side of his body; and expressive aphasia, difficulty expressing himself using spoken language.  After his stroke Richard was unable to speak, but "his memory and understanding [were] good."  Dr. Ellen Mayock, Richard's treating physician, does not know what Richard understood or did not understand because he was unable to tell her what he could understand.  Richard relied on his family

[*5] and on his legal advisers with respect to the MAC transaction. Richard's answer to the question of whether he wanted to sell his MAC stock would reflect his intention to sell. John represented to third parties that after the stroke Richard "could not communicate very well but could understand what was going on."

After Richard's stroke, John took over Richard's responsibilities at MAC, including maintenance of MAC's books and records. MAC wound down its contracting business and had not contracted on any construction jobs since 2000. MAC shifted its primary focus to the pursuit of the Stillwater appeal. MAC's only business activity after 2000 was the rental of its heavy equipment and its land.

On March 22, 2002, the Department of the Interior Board of Contract Appeals ruled in favor of MAC in the Stillwater appeal. On May 16, 2002, MAC received a $40,033,130 litigation award from US BOR, which represented contract damages and interest for the Stillwater appeal (Stillwater litigation award). On August 2 and October 9, 2002, MAC received additional interest payments on the Stillwater litigation award of $265,743 and $556,005, respectively. The total amount of MAC's Stillwater litigation award, with interest, was $40,854,878, all of which MAC received during its FYE March 31, 2003.

**[*6]** Following receipt of the Stillwater litigation award, MAC made estimated tax payments of $889,990 to the State of Oregon and $3,825,000 to the Internal Revenue Service (IRS) for its FYE March 31, 2003.

MAC and the Marshalls' Search for a Solution to the Tax Problem

In anticipation of MAC's receipt of the Stillwater litigation award, John sought help from John Dempsey and Michael Weber at PricewaterhouseCoopers (PwC). Mr. Dempsey was a senior manager at PwC in Portland, Oregon, and Mr. Weber was one of the partners that oversaw Mr. Dempsey.

Mr. Dempsey and Mr. Weber oversaw the preparation of the Marshalls' personal income tax returns, including those for taxable year 2003, and Mr. Weber signed them as the preparer. In anticipation of the Stillwater litigation award, John asked PwC to find out what liability MAC and the Marshalls would incur and whether there were any strategies that could help the Marshalls shelter some of the gain from the Stillwater litigation award.

Through consultations with PwC, the Marshalls considered a liquidation of MAC, an S corporation election for MAC, refreshing MAC's expired net operating losses (NOLs), and a sale of their MAC stock in 2002. The Marshalls decided not to pursue any of the tax planning options that Mr. Dempsey and Mr.

[*7] Weber recommended because John Marshall was uncomfortable with PwC's recommendations.

Peachtree Financial

John's insurance agent, Kenneth Evanson, introduced the Marshalls to Peachtree Financial. Peachtree Financial proposed to purchase the Marshalls' MAC stock in an installment sale. The Marshalls evaluated and rejected Peachtree Financial's proposal to purchase their MAC stock because they would lose control over their money.

Through Peachtree Financial, John was introduced to Fortrend International, Inc. (Fortrend). Peachtree Financial received a $306,000 referral fee for introducing John to Fortrend. Initially, John communicated and negotiated directly with representatives of Fortrend and represented the other MAC shareholders in his communications with Fortrend.

Fortrend

In a letter to John dated October 15, 2002, Steve Irgang of Fortrend represented that Fortrend "specializes in structuring transactions to solve specific corporate tax problems." A Fortrend promotional brochure that Mr. Irgang transmitted to John represented that "[c]lients of Fortrend have benefitted from our ability to structure transactions that minimize shareholder and corporate

[*8] liabilities." On October 22, 2002, John had a telephone conference with Mr. Irgang, Jeffrey Furman of Fortrend, Howard Kramer of Fortrend, Michael Bittner, a return preparer for Fortrend, Charles Klink, a lawyer representing Fortrend, and Mr. Dempsey.

On October 28, 2002, Alice Dill of Fortrend sent John, as representative of the MAC shareholders, a letter of intent to purchase the Marshalls' MAC stock. The letter of intent was from Essex Solutions, Inc. (Essex), signed by its president, Richard Leslie. On January 31, 2003, the shareholders of Essex were Willow Investment Trust (Willow) and MidCoast Credit Corp. (MidCoast). As of April 10, 2003, Essex was wholly owned by Willow. The Essex letter of intent reflected that $4,700,000 of the purchase price would consist of a promissory note "secured by tax refunds".

John reviewed and marked up the Essex letter of intent. On November 8, 2002, Randy Bae of Fortrend sent an email to John regarding "acquisition of Marshall Associated Contractors, Inc." with an attachment "illustrating the buyer's calculation of the stock purchase price." As proposed, the stock purchase price would be determined by taking the net value of the company after taxes and adding 50% of MAC's tax liability, resulting in an amount greater than the net asset value of the company. John himself calculated a "scenario sale" purchase

**[*9]** price and the split of MAC's tax liability between the Marshalls and Essex. John mulled over the Essex letter of intent for several weeks before deciding that he wanted the Marshalls to sell their MAC stock.

The Marshalls' Search for Advice

The Marshalls engaged PwC and the law firm of Schwabe Williamson & Wyatt (Schwabe) to advise them in connection with the Essex letter of intent. John interacted with Schwabe and PwC on behalf of Richard, Patsy, and Karen.

In late October 2002 John brought the Essex letter of intent to Mr. Dempsey and Mr. Weber of PwC. Both Mr. Dempsey and Mr. Weber had significant tax experience. Mr. Dempsey prepared a spreadsheet comparing the net cash after taxes that the Marshalls would receive in a liquidation of MAC versus a stock sale pursuant to the terms of the Essex letter of intent. Mr. Dempsey concluded that the Marshalls would receive approximately $6,800,000 more in net proceeds if they sold their MAC stock than if they liquidated MAC.

At the time that the Marshalls received the Essex letter of intent, MAC's assets consisted of: (i) an office and construction shop on 11 acres of land and heavy machinery and equipment, with a combined value of $2,776,500; (ii) an interest in Pearl Condo, LLC, valued at $4 million; (iii) $34,500,000 in cash; (iv) the Stillwater Equal Access to Justice claim for attorney's fees (Stillwater EAJA

[*10] claim) and the Sheep Creek appeal with projected future proceeds of $2,897,500; (v) $3,825,000 in prepaid Federal tax; and (vi) $889,990 in prepaid Oregon State taxes. MAC's liabilities consisted of: (i) $4,433,866 to UBOC (UBOC liability); (ii) $500,000 to Mr. Jochim (Jochim liability); and (iii) Federal and State taxes for its FYE March 31, 2003, due on the Stillwater litigation award.

Schwabe

In late November 2002 John took the Essex letter of intent to Schwabe. Schwabe had been the Marshalls' long-time legal advisers. They represented the Marshalls in the MAC transaction in their capacity as shareholders but did not represent MAC in the MAC transaction. The Marshalls relied on Schwabe to advise and represent them in the MAC transaction. Mitchell Hornecker was a business lawyer and the lead attorney at Schwabe representing the Marshalls with respect to the MAC transaction. Also involved in the MAC transaction for Schwabe were Kevin Kerstiens, Craig Russillo, Alan Pasternack, and Deric Luoto. John met with Mr. Hornecker on November 20, 2002, to discuss the Essex letter of intent. At the November 20, 2002, meeting, John told Mr. Hornecker that the purchase price was the value of the stock plus half of MAC's tax liability and that Essex was splitting the tax benefit with the Marshalls.

[*11] John was planning on developing MAC's 11 acres of land. He also intended to stay in the construction business and was considering starting a new construction company. John informed Mr. Hornecker that the Marshalls wanted to keep MAC's 11 acres of land, MAC's interest in Pearl Condo, LLC, MAC's heavy machinery and equipment, and control over the remaining US BOR litigation.

Essex proposed to use the cash in MAC's bank account to pay the purchase price for the MAC stock to the Marshalls. This caused Schwabe some concern. Mr. Hornecker was concerned that MAC could be pulled into bankruptcy if Essex used MAC's cash to pay the purchase price to the Marshalls. Mr. Russillo stated to Mr. Hornecker and Mr. Kerstiens on November 24, 2002, that "there is the possibility that the proposed stock sale can be attacked by the [bankruptcy] trustee as a fraudulent transaction under 11 USC 548" and concluded that "[i]f Essex is paying FMV for the stock, and has no intent to defraud any of its creditors, I think we're ok."

Mr. Kramer of Fortrend provided two references to Mr. Hornecker. The "nuts and bolts" of Schwabe's due diligence was done by Schwabe associates and Mr. Luoto, so Mr. Hornecker did not contact the references. Schwabe only conducted database and Internet research on Essex and Fortrend. Despite the "sketchy information" that Schwabe uncovered about related Fortrend entities' tax

[*12] noncompliance, Schwabe did not inquire about Fortrend's past deals. They also researched transferee liability and communicated to the Marshalls that if Essex took steps to render MAC unable to pay its tax liability, the IRS could pursue transferee liability against the Marshalls.

Schwabe had concerns regarding whether the buyer was going to defraud creditors and carefully structured the transaction to try to avoid any potential problems with that. Because of Schwabe's concern about transferee liability, Mr. Pasternack was asked to research the issue and prepare a memorandum. After extensive research, Mr. Pasternack concluded in his "Transferee Liability" memorandum that "the selling Marshall shareholders would likely be considered transferees of * * * [MAC's] property" with respect to the partial redemption and that "if Essex took steps that rendered * * * [MAC] unable to pay tax liabilities existing at the time of the redemption and the stock sale, there could be a basis for the IRS to seek to impose transferee liability on the selling shareholders" with respect to the stock sale. Mr. Hornecker discussed the risk of transferee liability with the Marshalls after Mr. Hornecker reviewed Mr. Pasternack's "Transferee Liability" memorandum and before the MAC transaction closed.

The Marshalls decided to sell their MAC stock in the MAC transaction under the negotiated terms despite being advised of the risks of the MAC

[*13] transaction by Schwabe.  Mr. Hornecker provided the Marshalls with a followup letter dated April 24, 2003, which was after the MAC transaction closed.  It did not contain any legal analysis and was intended "to remind [the Marshalls] of a few of the more significant issues arising from these transactions."

PricewaterhouseCoopers

After gathering information and conducting an analysis of the stock sale proposed by the Essex letter of intent, Mr. Dempsey became concerned about Fortrend's plan to offset MAC's income with its losses because it was similar to a listed transaction.  Mr. Dempsey discussed his concerns about the proposed stock sale with Mr. Weber, who expressed similar concerns.  Mr. Weber thought the MAC transaction seemed inconsistent with other transactions in which he had been involved.  Mr. Weber was concerned because Fortrend had used transactions like the proposed stock sale in the past to shelter income and avoid taxes.  Mr. Weber and Mr. Dempsey contacted PwC's national office to obtain advice.

Dan Mendelson was a national partner in PwC's tax quality and risk management (QRM) group in 2002 and 2003.  He assessed transactions that other PwC personnel were uncomfortable with or were concerned could be listed transactions to determine whether PwC could remain involved.  PwC's QRM group assessed PwC's compliance with IRS regulations to reduce the risk of

**[*14]** noncompliance and penalties' being imposed on PwC and PwC employees, among other things. Mr. Mendelson advised Mr. Dempsey and Mr. Weber that PwC should not consult or advise on the proposed stock sale. PwC concluded that the stock sale proposed by Essex was similar to a listed transaction and that it could not consult or advise on the proposed stock sale any further.

When Mr. Weber and Mr. Dempsey spoke with John about their concerns regarding the proposed stock sale, they were "trying to convey absolute concern over the transaction and the chances that it could be challenged by the IRS" to John. Mr. Dempsey and Mr. Weber told John before March 7, 2003, that the proposed stock sale was similar to a listed transaction, explained to John what a listed transaction was, and tried to discourage John from entering into the proposed stock sale. After advising John not to do the proposed stock sale, Mr. Weber thought that John understood the risks, including the risks associated with losing control over MAC. John's response to Mr. Weber's and Mr. Dempsey's warnings about the proposed stock sale was silence. After the MAC transaction closed on March 7, 2003, but before the Marshalls' personal returns were filed in October 2004, Mr. Weber and Mr. Dempsey informed John that the MAC transaction was similar to a listed transaction and would need to be disclosed on petitioners' returns.

[*15]  Mr. Dempsey informed John in person that PwC could not consult or advise on the proposed stock sale, which meant PwC could not be involved in discussions or negotiations with Fortrend regarding it.  MAC did not remain a client of PwC although the Marshalls did remain clients.  PwC provided services with respect to the preparation of the Marshalls' Forms 1040,  U.S. Individual Income Tax Return.  PwC still needed to determine the net cash that the Marshalls would receive from the MAC transaction so that PwC could compute their estimated tax and prepare their Forms 1040.

After PwC warned John about the proposed stock sale, Fortrend learned of PwC's concerns that the stock sale proposed by the Essex letter of intent was similar to a listed transaction.  Fortrend's Mr. Kramer and Mr. Bernstein of Midcoast telephoned Mr. Dempsey to try to persuade him that it was not similar to a listed transaction.  The telephone call from Mr. Kramer and Mr. Bernstein did not alleviate Mr. Dempsey's concerns about the proposed stock sale.  In January 2003, MidCoast sent the Marshalls, PwC, and Schwabe letters and promotional materials that represented that their tax strategy was "not the same as, or substantially similar to, the tax strategy contained in Notice 2001-16."

**[*16]** <u>Carrying Out the Transaction</u>

Utrecht-America Finance Co. (UAFC) was a Delaware company and subsidiary of Utrecht-America Holdings, which was a U.S. subsidiary of Rabobank Nederland (Rabobank).  Rabobank provided financing to Fortrend to purchase corporations in transactions similar to the MAC transaction.  Before Rabobank would fund a loan to Fortrend, it required security interest agreements in place securing the loan with the corporation's assets to allow Fortrend's use of the loan proceeds to acquire the corporation's stock.  Once Fortrend had title to the corporation, the corporation's cash would be used to pay off the Rabobank loan.  Rabobank typically analyzed audited financials during its credit check process.  Rabobank did not conduct a credit analysis if the corporation had sufficient cash to repay Rabobank's loan to the buyer.

On or about January 28, 2003, John executed a revised Essex letter of intent as the director of MAC (final Essex letter of intent).  On January 30, 2003, Cruz Alderete executed the final Essex letter of intent as the president of Essex.[4]  The final Essex letter of intent reflected that the purchase price for the Marshalls' MAC stock was to be calculated as follows:

---

[4]It is unclear when or why Mr. Alderete replaced Mr. Leslie as president of Essex.

[*17] An amount equal to (i) four million three hundred thousand dollars ($4,300,000) plus (ii) (A) one hundred percent (100%) of the Company's cash at Closing minus (B) forty percent (40%) of the tax liability of the Company as of the Closing based on the balance sheet of the Company, dated October 21, 2002, as amended.

The $4,300,000 amount in the final Essex letter of intent represented a discounted value for MAC's prepaid Federal and State taxes, which equaled $4,714,990. Initially, Essex proposed to pay the Marshalls 50% of MAC's tax liability as a premium over MAC's net asset value. Mr. Hornecker was able to negotiate the percentage of MAC's tax liability that would be paid as a premium to the Marshalls up to 60%. The purchase price for the Marshalls' MAC stock was calculated as follows:

| | |
|---|---|
| Total tax liabilities | $15,896,215 ($2,670,273 + $13,225,942) |
| 40% of total taxes | $6,358,486 (premium) |
| Cash at Rabobank | $19,912,952 ($26,271,438 – 6,358,486) |
| Credit for prepaid tax | $4,300,000 |
| Purchase price | $24,212,952 |

The MAC redemption and stock sale were effected by the closing of both the partial redemption agreement and the stock purchase agreement, which were integrated agreements. Under the partial redemption agreement the shareholders of MAC would receive assets worth $6,766,500, constituting all of MAC's assets other than MAC's cash, the future litigation proceeds, and its prepaid income tax, for approximately 18% of MAC shares.

**[*18]** The stock purchase agreement required MAC to "not [be] engaged in any material business or material business activity" and to have as its "sole assets" $26,271,438 in cash and the remaining US BOR litigation. On or about January 30, 2003, the Marshalls formed MA LLC, an Oregon limited liability company, taxable as a partnership. MA LLC had four equal members: John, Richard, Karen, and Patsy, with John and Richard as the managers. MA LLC was formed to put MAC's land and equipment and the Pearl Gateway Condo into an entity. Once MAC's land, equipment, and other noncash assets were held by MA LLC on March 7, 2003, MAC's only assets were the $26,271,438 in its Rabobank account No. 1345, its estimated tax payments, and the remaining US BOR litigation claim.

The stock purchase agreement required MAC to establish an account at Rabobank and deposit $26,271,438 in cash into this Rabobank account as a condition to closing. On February 18, 2003, Ms. Dill transmitted forms for a new Rabobank account for MAC to Mr. Hornecker, which John executed on February 20, 2003.

At the insistence of Fortrend, MAC opened Rabobank account No. 1345 on February 20, 2003. On March 3, 2003, MAC wired $80,259 and $25,982,847 into its new Rabobank account No. 1345. On March 4, 2003, MAC wired $208,332 into its Rabobank account No. 1345. As of March 4, 2003, the balance in MAC's

[*19] Rabobank account No. 1345 was $26,271,438. As of March 4, 2003, all of MAC's cash was on deposit in its new Rabobank account No. 1345. On February 20, 2003, Essex opened Rabobank account No. 1336. On March 6, 2003, Mr. Alderete executed Rabobank account forms for MAC's Rabobank account No. 1345 as the president of MAC.

Rabobank did not require Essex or MAC to submit audited financials because MAC's cash on deposit at Rabobank would be sufficient to pay off Essex's loan. The loan to Essex was short term because MAC had sufficient cash to pay Essex's loan, MAC's Rabobank account No. 1345 was pledged to repay Essex's loan, and Rabobank would have a security interest in MAC's Rabobank account No. 1345. In a Rabobank "Credit Report dated February 7, 2003," Chris Kortlandt, the vice president of Rabobank's Structured Finance Department in 2003, stated that the stock sale was referred to Rabobank by Fortrend and that there would be a

> [p]ledge of the accounts (at Rabobank) of our borrower, Essex Solutions, and its newly acquired subsidiary, Marshall [MAC]. Marshall [MAC] will hold cash balances of $31mm [million] in an account at Rabobank (pledged to us).

> At closing, Marshall [MAC] guarantees Essex Solutions obligations under the loan, which guarantee will be secured by Marshall [MAC] cash accounts held at Rabobank.

[*20] The credit report also stated that: (1) even though the loan was to be provided up to 30 days, "it is expected to be repaid within 2 business days"; (2) "[w]e will receive irrevocable payment instructions to transfer the total cash balance ($31mm) from the * * * [MAC account] to * * * [Essex's account] held at Rabobank, which funds will be used as repayment for our loan"; and (3) "the loan will be cash collateralized."

Rabobank's loan to Essex was low risk for nonrepayment because it was cash collateralized by MAC's cash in Rabobank account No. 1345, MAC guaranteed the loan, and Rabobank had a security interest in MAC's Rabobank account No. 1345 and Essex's Rabobank account No. 1336.

Mr. Alderete, as president of Essex, executed a promissory note in the amount of $30 million payable to UAFC dated as of March 6, 2003 (promissory note). The promissory note was explicit in stating that the advanced funds were to be used to acquire the MAC stock and that Essex's loan would not be funded until Essex and MAC had on deposit in their respective Rabobank accounts the principal amount of the loan plus $1 million. The balances in MAC's Rabobank account No. 1345 and Essex's Rabobank account No. 1336 would at all times exceed the outstanding balance of Essex's loan and the interest and fees due on the loan.

[*21] A control agreement among Essex as the grantor, UAFC, and Rabobank dated as of March 6, 2003, was executed by Mr. Alderete, as president of Essex (Essex control agreement). The Essex control agreement gave UAFC control over all cash, instruments, and financial assets, Essex's Rabobank account No. 1336, and all security entitlements.

A guaranty by MAC, the guarantor, in favor of UAFC dated as of March 6, 2003, was executed by Mr. Alderete as president of MAC (MAC guaranty). Pursuant to the MAC guaranty, MAC unconditionally guaranteed the punctual payment of all of Essex's obligations and liabilities to UAFC and granted UAFC the right to offset MAC's Rabobank account No. 1345 to satisfy Essex's obligations and liabilities. Essex's loan from Rabobank was conditional upon the MAC guaranty. A security and assignment agreement by MAC as the guarantor in favor of UAFC dated as of March 6, 2003, was executed by Mr. Alderete as president of MAC (MAC security agreement). Pursuant to the terms of the MAC security agreement, MAC granted UAFC a first priority security interest in MAC's Rabobank account No. 1345 to secure the obligations of MAC, under the MAC guaranty, to UAFC.

A control agreement among MAC as the grantor, UAFC, and Rabobank dated as of March 6, 2003, was executed by Mr. Alderete as president of MAC

[*22] (MAC control agreement). The MAC control agreement gave UAFC control over MAC's Rabobank account No. 1345, all cash, instruments, and financial assets contained, and all security entitlements. Rabobank and UAFC required the MAC guaranty, the MAC security agreement, and the MAC control agreement to be executed before Essex's loan would be funded. The MAC guaranty, the MAC security agreement, and the MAC control agreement became effective simultaneously with the closing of the stock sale.

Transaction

On March 7, 2003, pursuant to the partial redemption agreement, MAC redeemed 180 shares of capital stock from each of the Marshalls in exchange for $1,691,625 worth of MAC's noncash tangible assets, for a total of $6,766,500. MAC's noncash tangible assets consisted of heavy equipment, shop equipment and tools, office electronics, machinery, vehicles, trailers, leases, the 11 acres of land where MAC maintained its office, and MAC's interest in Pearl Condo, LLC. In connection with the partial redemption, MAC conveyed its noncash tangible assets to MA LLC on March 7, 2003, at the direction of the MAC shareholders.

On March 7, 2003, pursuant to the future litigation proceeds agreement entered into by petitioners and Essex, MAC transferred its rights to 80.35% of the Sheep Creek appeal proceeds and 100% of the Stillwater EAJA claim proceeds

[*23] with a combined value of $2,544,480 to the Marshalls. The Marshalls purportedly sold their remaining MAC stock to Essex. On the same day, the stock sale closed and, pursuant to the stock purchase agreement, the Marshalls assumed MAC's nontax liabilities, which consisted of the $4,433,866 UBOC liability and the $500,000 Jochim liability.

On March 7, 2003, Essex's account No. 1336 at Rabobank was credited with $30 million, which represented a draw under the loan agreement with UAFC. Immediately before the stock sale, Essex's sole asset was the $30 million in UAFC loan proceeds and its sole liability was the $30 million UAFC loan payable. Pursuant to the stock purchase agreement, Essex wired $24,410,000 from its Rabobank account No. 1336 to MA LLC's USBanCorp Piper Jaffray account No. 5091 at the direction of the Marshalls and wired $200,000 to Schwabe's trust account. Pursuant to the stock purchase agreement, the Marshalls conveyed their outstanding shares of MAC to Essex.

On March 7, 2003, funds of $25 million were transferred from MAC's Rabobank account No. 1345 to Essex's Rabobank account No. 1336. Essex paid MAC a $150,000 guaranty fee. At the end of the day on March 7, 2003, after taking into account MAC's transfer of $25 million from its Rabobank account No. 1345 to Essex's Rabobank account No. 1336 and MAC's receipt of the $150,000

[*24] guaranty fee from Essex, the balance in MAC's Rabobank account No. 1345 was $1,421,438.01. On March 7, 2003, Essex's Rabobank account No. 1336 was debited in the amount of $30 million to repay the $30 million loan due to UAFC. Essex's loan was drawn down and repaid on the same day. Essex paid a $100,000 upfront fee to UAFC.

At the end of the day on March 7, 2003, after taking into account Essex's repayment of its loan, payment of the $150,000 guaranty fee to MAC, and payment of the $100,000 upfront fee to UAFC, the balance in Essex's Rabobank account No. 1336 was $139,600. On March 7, 2003, Schwabe received notification from UAFC that the Essex loan had been repaid and Schwabe returned the $200,000 to Essex on March 7, 2003. On March 13, 2003, MA LLC transferred funds of $10,705,173 from its USBanCorp Piper Jaffray account No. 5091 to Richard and Patsy's joint USBanCorp Piper Jaffray account No. 7198. MA LLC also transferred funds of $10,705,173 from its USBanCorp Piper Jaffray account No. 5091 to John and Karen's joint USBanCorp Piper Jaffray account No. 5089.

Before the MAC transaction, MAC had $40,650,877 in assets and $20,830,081 in liabilities and the net asset value of the MAC stock was $19,820,796. At the time the Marshalls assumed the UBOC liability and the

[*25] Jochim liability, MAC's remaining liabilities consisted of Federal and State income tax liabilities totaling $15,896,215 for its FYE March 31, 2003. The Marshalls received $24,410,400 as the purchase price for their MAC stock.

Postclosing Activities

Pursuant to the stock purchase agreement, Essex was required to change the name of MAC. The Marshalls retained the name of MAC because John intended to stay in the construction business. MAC made the following payments on March 10, 2003: $50,000 to Baguette Holdings, LCC; $50,000 to Bittner & Co., LLP; and $37,500 to Joseph Valentino. On March 13, 2003, Essex merged into MAC with MAC surviving and changing its name to First Associated Contractor, Inc.

On April 13, 2003, MAC filed its Form 1120, U.S. Corporation Income Tax Return, for its FYE March 31, 2003. MAC claimed a bad debt deduction of $39,772,396 on the 2003 return to offset its taxable income from the Stillwater litigation award. The bad debt loss deduction claimed by MAC was based upon U.S. Treasury bills. On March 13, 2003, Willow purportedly contributed 140,000 U.S. Treasury bills with a face value of $140,000 and $100,000 cash to MAC in a section 351 transaction. Willow claimed that it had a $53,333,288 tax basis in the U.S. Treasury bills.

[*26] MAC's 2003 return reflected a refund due of $3,825,000. MAC received a refund of $3,825,000 for its FYE March 31, 2003, from the IRS on May 29, 2003. MAC used the $3,825,000 Federal tax refund to make the following payments: $840,000 to Fortrend; $510,000 to Willow; $306,000 to Peachtree; $241,000 to Irgang & Co.; $200,000 to Manatt, Phelps, Phillips; $110,743 to Jeffer, Mangels, Butler & Marmaro; $100,000 to Susan Smith; $30,000 to Oceanus Solutions, LLC; and $7,846 to TC Capital Management, LLC.

MAC administratively dissolved on June 6, 2003, pursuant to Or. Rev. Stat. sec. 63.647, was reinstated on September 12, 2003, and then was administratively dissolved on March 20, 2009. MAC is no longer in existence under Oregon law.

The Marshalls' Protective Disclosure

On October 15, 2004, Richard and Patsy filed their Form 1040 for taxable year 2003, which included Form 8886, Reportable Transaction Disclosure Statement, for the MAC transaction. On October 15, 2004, John and Karen filed their Form 1040 for taxable year 2003, which included Form 8886 for the MAC transaction. The MAC transaction was registered with the IRS as a tax shelter. Richard and Patsy attached Form 8271, Investor Reporting of Tax Shelter Registration Number, for the MAC transaction to their Form 1040 for taxable year 2004.

**[\*27]** <u>Notice of Deficiency to MAC</u>

The IRS disallowed MAC's claimed bad debt deduction of $39,772,396 because MAC could not support or substantiate its basis in the purported bad debt, among other reasons. On February 19, 2009, respondent timely mailed a notice of deficiency to MAC for FYE March 31, 2003, 2004, and 2005. In the notice, the IRS determined a gross valuation misstatement penalty against MAC under section 6662(h), or alternatively a substantial understatement penalty under section 6662(a) and (b)(2), for FYE March 31, 2003.

Neither MAC nor anyone acting on its behalf filed a petition in this Court. On June 24, 2009, the IRS made assessments against MAC for FYE March 31, 2003, for income tax of $15,482,046, accuracy-related penalties of $6,192,818, and interest of $9,592,446.

On October 31, 2009, collection of MAC's liability was assigned to a field revenue officer. Respondent's revenue agent conducted database searches for MAC's assets in Oregon, Nevada, and California, filed notices of Federal tax liens on MAC's assets in Nevada, and issued levies to three banks where MAC maintained accounts.

**[*28]** <u>Notices of Transferee Liability to Petitioners</u>

On August 26, 2011, after determining that MAC had no assets from which respondent could collect, respondent sent a notice of liability to Richard in which it was determined that he was liable as a transferee for $13,896,825 of the tax liability of MAC for its FYE March 31, 2003, plus interest. On October 26, 2011, respondent sent notices of liability to John, Karen, and Patsy, respectively, in which it was determined that each was liable as a transferee for $13,896,825 of the tax liability of MAC for its FYE March 31, 2003, plus interest. On October 26, 2011, respondent sent a notice of liability to MA LLC, in which it was determined that MA LLC was liable as a transferee and as a transferee of a transferee for $6,776,500 of the tax liability of MAC for its FYE March 31, 2003, plus interest. In response to the notices, Richard and Patsy filed a timely petition on November 28, 2011, MA LLC filed a timely petition on December 15, 2011, and John and Karen filed a timely petition on December 16, 2011.

OPINION

I. <u>Legal Standard</u>

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the tax with respect to which the transferee liability

**[\*29]** was incurred.  Section 6901(a) does not create or define a substantive liability but merely provides the Commissioner a remedy for enforcing and collecting from the transferee of property the transferor's existing liability.  Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), aff'g 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972).

Once the transferor's own tax liability is established, the Commissioner may assess that liability against a transferee under section 6901 only if two distinct requirements are met.  First, the transferee must be subject to liability under applicable State law, which includes State equity principles.  Second, under principles of Federal tax law, that person must be a "transferee" within the meaning of section 6901.  See Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1017-1019 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2012-61; Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 183-184 (2d Cir. 2013), vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61; Starnes v. Commissioner, 680 F.3d 417, 427 (4th Cir. 2012), aff'g T.C. Memo. 2011-63; Swords Trust v. Commissioner, 142 T.C. 317, 336 (2014).

The Commissioner bears the burden of proving that a person is liable as a transferee.  Sec. 6902(a); Rule 142(d).  The Commissioner does not have the burden, however, "to show that the taxpayer was liable for the tax."  Sec. 6902(a).

**[\*30]** Therefore, petitioners have the burden of proving that MAC is not liable for $21,674,864 of tax and penalty.  See Rule 142(a)(1), (d); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also United States v. Williams, 514 U.S. 527, 539 (1995) (noting that "the Code treats the transferee as the taxpayer" for this purpose); L.V. Castle Inv. Grp., Inc. v. Commissioner, 465 F.3d 1243, 1248 (11th Cir. 2006).

We must determine whether respondent has shown that petitioners are liable as transferees.

II.  Petitioners' Transferee Status Under Oregon Uniform Fraudulent Transfer Act

We apply Oregon State law to determine whether petitioners are liable, as transferees, for the unpaid tax of MAC since the transaction took place in Oregon. See Commissioner v. Stern, 357 U.S. 39, 45 (1958).  Oregon has adopted the Uniform Fraudulent Transfer Act (UFTA), codified at chapter 95 of the Oregon Statutes.  See Or. Rev. Stat. secs. 95.200 to 95.310 (2015).  The Oregon Uniform Fraudulent Transfer Act (OUFTA) broadly defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease and the creation of a lien or other encumbrance." Id. sec. 95.200(12).  Where a debtor transfers property to a transferee and thereby avoids

**[\*31]** creditor claims, OUFTA provides creditors with certain remedies against the transferee. See id. sec. 95.260.

Under Oregon common law, the creditor must prove a fraudulent transfer by a preponderance of the evidence under the OUFTA. Norris v. R&T Mfg., LLC, 338 P.3d 150 (Or. Ct. App. 2014).

### A.  Constructive Fraud

Respondent's arguments under OUFTA are predicated on the assumption that the series of transfers among MAC, Essex, and Fortrend should be collapsed and treated as if MAC had sold its assets and then made liquidating distributions to the shareholders.  If the transfers are collapsed accordingly, then MAC will have transferred substantially all of its assets to petitioners and received less than reasonably equivalent value.  If the preceding is found, it follows that petitioners will be liable as transferees of MAC's assets under Or. Rev. Stat. sec. 95.240(1) as further explained below.  Alternatively, respondent argues that MA LLC is liable as a transferee of the assets transferred in the partial redemption under OUFTA's constructive fraud provisions.

### 1.  Collapsing the Transaction

Respondent contends that the transfers among MAC, Essex, and petitioners should be collapsed and recharacterized under Oregon law as a redemption of the

[*32] Marshalls' MAC shares, with the Marshalls receiving a $31,339,897 liquidating distribution in exchange for their shares. Oregon courts have not addressed this type of transaction; however, courts in jurisdictions with fraudulent transfer provisions similar to Oregon's have "collapsed" transactions if the ultimate transferee had constructive knowledge that the debtor's debts would not be paid. See Salus Mundi Found. v. Commissioner, 776 F.3d 1010; Diebold Found., Inc. v. Commissioner, 736 F.3d 172; Starnes v. Commissioner, 680 F.3d 417.

In Salus Mundi Found. the Court of Appeals for the Ninth Circuit addressed the application of New York's fraudulent transfer provisions to a transaction similar to the transaction in these cases. It concluded that if constructive knowledge of the fraudulent scheme could be shown from the conduct of the final transferees, multiple transfers could be collapsed under State law. Salus Mundi Found. v. Commissioner, 776 F.3d at 1020. In Diebold Found., Inc. v. Commissioner, 736 F.3d at 186, the Court of Appeals for the Second Circuit addressed the application of the New York UFTA to the same transaction at issue in Salus Mundi Found. and held that multiparty transactions can be collapsed where the debtor's property is "reconveyed * * * for less than fair consideration" and the ultimate transferee had "constructive knowledge of the entire scheme."

[*33] In Starnes, the Court of Appeals for the Fourth Circuit addressed the application of North Carolina's fraudulent transfer provisions to another transaction similar to the transaction at issue in these cases and ruled that multiple transfers could be collapsed if the ultimate transferee had constructive knowledge that the debtor's tax liabilities would not be paid. If the ultimate transferees "were on inquiry notice * * * and failed to make reasonably diligent inquiry, they are charged with the knowledge they would have acquired had they undertaken the reasonably diligent inquiry required by the known circumstances." Starnes v. Commissioner, 680 F.3d at 434.

In Tricarichi v. Commissioner, T.C. Memo. 2015-201, we noted that the Ohio Supreme Court did not have a case addressing this precise issue. We relied on the previously discussed cases when applying Ohio's UFTA because we concluded that the Ohio Supreme Court would find them persuasive as Ohio's UFTA tracks the uniform law almost verbatim and the fraudulent transfer provisions at issue in these cases also mirrored the uniform law or were materially similar to it. Id. at *37-*38. We conclude that the Oregon Supreme Court would also find the previously cited cases persuasive and would follow these decisions if faced with this type of transaction as Oregon's UFTA closely resembles Ohio's UFTA. If petitioners had constructive knowledge that MAC's tax liability would

**[*34]** not be paid, the transfers at issue may be collapsed. Finding that a person had constructive knowledge does not require finding that he had actual knowledge of the plan's minute details. It is sufficient if, under the totality of the surrounding circumstances, he "should have known" about the tax-avoidance scheme. HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 (2d Cir. 1995).

Constructive knowledge also includes "inquiry knowledge." Constructive knowledge may be found where the initial transferee became aware of circumstances that should have led to further inquiry into the circumstances of the transaction, but no inquiry was made. Id. Some cases define constructive knowledge as the knowledge that ordinary diligence would have elicited, while others require more active avoidance of the truth. Diebold Found., Inc. v. Commissioner, 736 F.3d at 187. We need not decide which of these formulations is appropriate because petitioners had "constructive knowledge" under either standard.

Our analysis focuses on what John knew because John assumed the responsibility of representing the Marshalls. In determining what the transferees knew, we have to focus on what they were advised and what they themselves appreciated. See id. at 188-189. The Marshalls, Schwabe, and PwC had constructive knowledge of the entire scheme. John knew that Essex was interested

**[*35]** in buying MAC only for its tax liability; that Essex intended to use high-basis low-value assets to offset MAC's income; that Essex intended to obtain a refund of MAC's prepaid taxes, a plan he was leery about; and that Essex was splitting MAC's avoided taxes with the Marshalls.

PwC and Schwabe had a sophisticated understanding of the entire scheme. Notably, before the MAC transaction closed, each of the Marshalls was warned by Schwabe of the risks of transferee liability and John was warned by PwC that the stock sale was similar to a listed transaction and was advised by PwC not to engage in the stock sale. Petitioners knew that the Stillwater litigation award would be considered income to MAC and be subject to corporate income tax for 2003. This knowledge motivated petitioners to enter into a transaction to mitigate this tax liability.

Further, MidCoast and Fortrend promotional material referenced Notice 2001-16, 2001-1 C.B. 730.[5] PwC told John that the proposed stock sale was

---

[5]Notice 2001-16, 2001-1 C.B. 730, indicated that the IRS may challenge transactions in which the assets of a corporation are sold following the purported sale of the corporation's stock to an intermediary and that these and substantially similar transactions are designated "listed transactions" for purposes of sec. 1.6011-4T(b)(2), Temporary Income Tax Regs., 65 Fed. Reg. 11207 (Mar. 2, 2000), and sec. 301.6111-2T, Temporary Proced. & Admin. Regs., 65 Fed. Reg. 11218 (Mar. 2, 2002).

[*36] similar to a listed transaction.[6]  Given this reference by Fortrend and Midcoast and especially PwC's warning to John, the Marshalls and their Schwabe advisers were or should have been on heightened alert for other red flags.  That the Marshalls were aware of Notice 2001-16, supra, is evidenced by the protective disclosure attached to their Forms 1040 that referenced Notice 2001-16, supra, and their signatures on their Forms 1040.

The Marshalls recognized the large tax liability arising from the Stillwater litigation award and entered into a series of transfers to minimize the liability.  John and the Marshalls' advisers are analogous to the advisers in Diebold Found., Inc. and Richard, Patsy, and Karen are akin to the shareholders in that case.  The Court of Appeals for the Second Circuit in Diebold Found., Inc. found that if the advisers knew or should have known then the transferee is deemed to have had the same knowledge and had a duty to inquire.  See Salus Mundi Found. v. Commissioner, 776 F.3d at 1019-1020; Diebold Found., Inc. v. Commissioner, 736 F.3d at 188-190.  The Marshalls had a duty to inquire, and they were advised that there was a significant risk of transferee liability.  Cf. Slone v. Commissioner, T.C. Memo. 2016-115, at *14-*17 (distinguishable on factual grounds)

---

[6]John disputes what PwC actually told him.  However, it was clear from the record that PwC and John discussed this.

[*37] ("Petitioners and their advisers had no reason to believe that Fortrend's strategies were other than legitimate tax planning methods."). Accordingly, petitioners are transferees of MAC, as MAC sold its assets and MA LLC received noncash assets and the Marshalls received liquidating distributions in exchange for their shares.

B. Petitioners' Liability as Transferees Under Oregon Law

Or. Rev. Stat. sec. 95.240(1) establishes that a transfer is fraudulent with respect to a creditor where: (1) the creditor's claim arose before the transfer; (2) the transferor did not receive "a reasonably equivalent value in exchange for the transfer"; and (3) the transferor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Petitioners repeatedly argue that they cannot be found liable as transferees because they acted in good faith. An intent requirement is absent from Or. Rev. Stat. sec. 95.240, and the Or. Rev. Stat. sec. 95.270(1) good faith defense does not apply to Or. Rev. Stat. sec. 95.240. Nor can petitioners claim the good-faith defense to reduce the amount of the liability under Or. Rev. Stat. sec. 95.270(5) as we have found the Marshalls to have had at least constructive knowledge. Further, we find that the three elements of Or. Rev. Stat. sec. 95.240(1) are met and that petitioners are liable as transferees of MAC under Oregon law.

**[*38]**         1. <u>Claim</u>

"Claim" is defined expansively as a "right to payment." <u>Id.</u> sec. 95.200(3).

A right to payment constitutes a claim regardless of whether it is "reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured." <u>Id.</u>  A "creditor" is

any person who has a "claim". <u>Id.</u> sec. 95.200(4).  Given this broad definition,

transfers are fraudulent as to creditors whose claims have not been finally

determined, and even as to creditors whose claims are not yet due. <u>See</u> <u>Zahra</u>

<u>Spiritual Tr. v. United States</u>, 910 F.2d 240, 248 (5th Cir.1990).  Because

"unmatured tax liabilities are taken into account in determining a debtor's

solvency, they are 'claims' and should be treated as such under the expansive

definition of the term 'claim'" in the UFTA.  <u>Stuart v. Commissioner</u>, 144 T.C.

235, 258-259 (2015).

Petitioners do not dispute that there was a claim.  MAC received the

Stillwater litigation award in May 2002 and additional interest payments in August

and October of the same year, generating a Federal tax liability.  The transfer of

MAC's assets to petitioners occurred on March 7, 2003.  Accordingly, respondent

had a claim against MAC before the transfer occurred.

**[\*39]** 2. <u>Reasonably Equivalent Value</u>

The second factor of Or. Rev. Stat. sec. 95.240(1) is whether the transferor received reasonably equivalent value in exchange for the transfer, which is a question of fact. See <u>Shockley v. Commissioner</u>, T.C. Memo. 2015-113. Once the transaction is collapsed, the timing of the transfers is irrelevant and we must determine whether MAC's transfers of assets to petitioners were for reasonably equivalent value.

Petitioners received over $33.7 million[7] in exchange for their stock and the assumption of the UBOC liability and the Jochim liability, worth a total of $4.9 million. Before the partial redemption and sale of the MAC stock, the net asset value of petitioners' stock was about $19.8 million[8] and petitioners received approximately $28.8 million[9] in exchange for their shares. Petitioners received approximately $9 million in consideration in excess of the value of their MAC

---

[7]Cash of $24,410,400, noncash assets of $6,776,500, and future litigation proceeds rights worth $2,544,480

[8]Assets of $40.6 million less $20.8 million in the UBOC and Jochim liabilities and taxes.

[9]The total of $33.7 million received less the liabilities of $4.9 million assumed.

[*40] stock.  Thus, MAC did not receive reasonably equivalent value in exchange for the proceeds from the sale of its assets.

### 3. Insolvency

The third factor of Or. Rev. Stat. sec. 95.240(1) is whether the transferor was insolvent or became insolvent as a result of the transfer.  A debtor is insolvent under OUFTA "if, at a fair valuation, the sum of * * * [its] debts is greater than all of * * * [its] assets."  Id. sec. 95.210(1).  Solvency is measured at the time of the transfer.  Id. sec. 95.240(1).

Petitioners' argument that MAC was solvent at the time of the partial redemption because it still had over $26 million cash in its bank account is unpersuasive.  The precise timing of the transfers is immaterial since we collapsed the transaction under OUFTA and solvency must be judged as MAC transferred assets to petitioners.

After MAC's transfer of $25 million to petitioners via Essex, MAC was left with over $15 million in State and Federal tax liabilities and $6.8 million in assets, consisting mostly of estimated tax deposits.  Thus, MAC became insolvent as a result of the MAC transaction.

**[\*41]** C.  <u>Petitioners' Liability for Penalties Under Oregon Law</u>

Petitioners argue that they are not liable for accuracy-related penalties because the penalty was not a "current liability" under OUFTA when the MAC stock was sold to Essex but was incurred by the new owners of MAC after the stock sale.  Petitioners reliance on <u>Stanko v. Commissioner</u>, 209 F.3d 1082 (8th Cir. 2000), <u>rev'g</u> T.C. Memo. 1996-530, for the proposition that penalties for negligent or intentional misconduct that occurred months after the transfer are not existing at the time of the transfer is misplaced.

In <u>Tricarichi v. Commissioner</u>, T.C. Memo. 2015-201, we found an argument similar to this unpersuasive.  In that case we held that the UFTA's expansive definition of "claim" encompasses this type of penalty regardless of whether the penalty existed at the time of the transfer.  <u>Id.</u> at \*62.  Further, we found the UFTA applies to future and present creditors if the transfer was not for reasonably equivalent value and the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due" and the IRS was a future creditor.  <u>Id.</u> at \*62-\*63 (quoting Ohio Rev. Code sec. 1336.04(A)(2)(b)); <u>see</u> Or. Rev. Stat. sec. 95.230(1)(b)(B).

[*42] Oregon's and Ohio's statutes are materially similar. Accordingly, for the reasons we stated in Tricarichi, we find that petitioners are liable under Oregon law for the penalties.

## III. Federal Transferee Liability

For purposes of section 6901 the term "transferee" includes, inter alia, donee, heir, legatee, devisee, distributee, and shareholder of a dissolved corporation. See sec. 6901(h); sec. 301.6901-1(b), Proced. & Admin. Regs. As stated previously, recent authority has treated the inquiry as two separate prongs. See Slone v. Commissioner, 810 F.3d 599 (9th Cir. 2015), vacating and remanding T.C. Memo. 2012-57; Salus Mundi, Found. v. Commissioner, 776 F.3d at 1018-1019. Having found petitioners liable under State law, we must now determine whether they are liable under Federal law.

The Court of Appeals for the Ninth Circuit recently held that a court must consider whether to disregard the form of a transaction by which the transfer occurred when determining transferee status for Federal law purposes. See Slone v. Commissioner, 810 F.3d at 605-606. In performing the inquiry, the court must focus "holistically on whether the transaction had any practical economic effects other than the creation of income tax losses." Id. at 606 (quoting Reddam v. Commissioner, 755 F.3d 1051, 1060 (9th Cir. 2014), aff'g T.C. Memo. 2012-106).

[*43] The MAC transaction had no economic effects other than the creation of a loss for MAC. The Marshalls recognized the income tax liability from the litigation awards and entered into a series of transfers solely to evade their tax liability. For this reason and the reasons discussed above, we disregard the form of the MAC transaction and find that petitioners are transferees within the meaning of section 6901.

IV. Transferor Liability for Unpaid Tax

In arguing whether MAC actually owed the tax liability, petitioners rely on the form of the MAC transaction's being respected. Petitioners bear the burden of proof on this matter and offer no alternative arguments as to MAC's tax liability. See sec. 6902(a); Rule 142(d). Petitioners point to nothing in the record that shows that respondent incorrectly determined or improperly assessed MAC's tax liability for its FYE March 31, 2003. As the MAC transaction was collapsed and treated as a de facto liquidation to petitioners, we conclude that MAC was liable for the unpaid tax for its FYE March 31, 2003.

V. Collection Efforts Against MAC

Petitioners argue that respondent must show that he exhausted all reasonable efforts to collect the tax liability from the transferor before proceeding against the transferees.

[*44] We must look to Oregon law to determine whether respondent has an obligation to pursue all reasonable collection efforts against a transferor before proceeding against a transferee. See Hagaman v. Commissioner, 100 T.C. 180, 183-184, (1993); Jefferies v. Commissioner, T.C. Memo. 2010-172; Upchurch v. Commissioner, T.C. Memo. 2010-169. Where "the transferor is hopelessly insolvent, the creditor is not required to take useless steps to collect from the transferor." Zadorkin v. Commissioner, T.C. Memo. 1985-137, 49 T.C.M. (CCH) 1022, 1028 (1985).

We think respondent did pursue all reasonably necessary collection efforts, and petitioners have not shown that respondent's efforts to collect against MAC were not reasonably exhausted. MAC was left insolvent after the MAC transaction and was administratively dissolved in March 2009. Respondent's revenue agent conducted database searches for MAC's assets in Oregon, Nevada, and California, filed notices of Federal tax lien on MAC's assets in Nevada, and issued levies to three banks where MAC maintained accounts. Nothing in the record states that MAC still exists, but the record instead suggests that MAC was not a viable entity.

If for the sake of argument, we presume that respondent did not take reasonable steps, the OUFTA does not require a creditor to pursue all reasonable

**[\*45]** collection efforts against the transferor.  See Or. Rev. Stat. secs. 95.200-95.310.  Therefore, respondent was not required to exhaust collection efforts against MAC, and petitioners may be held liable.

Accordingly, we conclude that (1) petitioners are liable under Oregon law for the full amount of MAC's 2003 tax deficiency and penalty and (2) the IRS may collect this liability from petitioners as "transferees" pursuant to section 6901.

To reflect the foregoing,

Decisions will be entered under

Rule 155.